# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

CEDRICK FRAZIER and TAMARA
FRAZIER,

    Plaintiffs,

    v.                   2:21-CV-21

SOUTHEAST GEORGIA HEALTH
SYSTEM, INC., et al.,

    Defendants.

## ORDER

Before the Court are Defendants' partial motions for summary judgment.  Dkt. Nos. 181, 182.  The motions have been fully briefed and are ripe for review.  Dkt. Nos. 181-1, 182-1, 183, 201, 202, 213, 214, 217, 220, 221.  For the reasons stated below, Defendants' motions are **GRANTED.**

## BACKGROUND

This case arises out of Plaintiff Cedrick Frazier's surgery and post-operation treatment at Southeast Georgia Health System, Inc. ("SGHS"), in January and February of 2020.  Dkt. No. 77.

On December 27, 2019, Defendant Dr. Sherman Stevenson examined Mr. Frazier and diagnosed him with a severe left-sided deviated septum.  Dkt. No. 181-2 at 18:63:11-22; Dkt. No. 181-15 at 78 (hospital records showing Dr. Stevenson's notes from this

visit stating his examination of Mr. Frazier's nose revealed "[s]evere left-sided deviated septum obstructing greater than 90% of the view by anterior rhinoscopy, turbinate hypertrophy bilaterally").

Plaintiff Tamara Frazier, Mr. Frazier's wife, accompanied Mr. Frazier to the December 27, 2019 visit. Dkt. No. 181-13 at 10:32:16-22. Mrs. Frazier recalls that Dr. Stevenson used a headlight to look into her husband's mouth and down his throat. Id. at 10:33:6-13. Plaintiffs do not recall everything Dr. Stevenson said during the December 27, 2019 visit, but they do remember Dr. Stevenson explaining that Mr. Frazier could continue using medications to try to get some relief but that the better option might be a septoplasty and reduction of inferior turbinates. Dkt. No. 181-2 at 18:65:15-66:21; Dkt. No. 181-13 at 10:33:15-11:35:6; Dkt. No. 77 ¶ 19; Dkt. No. 181-14 at 25:97:10-19 (Dr. Stevenson's testifying that during the December 27, 2019 visit, he verbally reviewed Mr. Frazier's diagnosis which required the recommended surgical procedure).

During the December 27, 2019 visit, Dr. Stevenson verbally reviewed both Mr. Frazier's diagnosis and the nature and purpose of the procedure with Plaintiffs. Dkt. No. 181-1 ¶ 47; Dkt. No. 201-1 ¶ 47. Dr. Stevenson testified that during this visit, he also reviewed the material risks of the procedure, including risks of infection and bleeding, temporary pain and numbness around the

front of the nose, teeth, and lips, and the risks of anesthesia
that the anesthesiologist also typically reviews with the patient
on the day of surgery along with an additional anesthesiology
consent. Dkt. No. 181-14 at 19:75:22-76:10, 20:77:2-20, 30:119:4-
5, 30:117:18-119:3, 31:122:25-123:15. Dr. Stevenson also
testified that he reviewed the likelihood of success of the
procedure, the practical alternatives to the procedure, and Mr.
Frazier's prognosis if he rejected the procedure. Id. at 25:97:10-
19, 26:102:7-103:18. Plaintiffs, however, dispute whether Dr.
Stevenson orally reviewed the material risks of the procedure,
but, ultimately, do not recall everything Dr. Stevenson said during
this visit. Dkt. No. 181-2 at 11:35:9-15.

Mr. Frazier underwent the septoplasty and inferior turbinate
reduction procedure on January 21, 2020. Dkt. No. 181-2 at 8:19-
21. That day, before the surgery took place, Mr. Frazier signed
the Patient Consent for Anesthesia ("Anesthesia Consent Form")
after reading and discussing it with nurse Rachel Faircloth and
anesthesiologist Dr. Kristin West. Dkt. No. 181-2 at 23:84:3-
85:12, 23:85:13-24:88:22.

At that same time, Mr. Frazier also signed Defendants'
Informed Consent for Procedure Form ("Informed Consent Form").
Id. at 2-3; see also Dkt. No. 181-16 (Informed Consent Form showing
that Mr. Frazier and Nurse Faircloth signed it at approximately
11:01 a.m. on January 21, 2020). However, Mr. Frazier claims that

Nurse Faircloth explained that the form, titled "Southeast Georgia Health System Informed Consent for Procedure/Treatment[,]" was only for the purpose of administering Mr. Frazier medication to help bring his pulse rate down on the day of surgery.  Dkt. No. 181-2 at 18:64:11-65:5.   Mr. Frazier further contends Nurse Faircloth presented him only the second page of the Informed Consent Form and that he did not see the first page.  Id. 20:71:16-72:4, 21:76:19-77:2.

Mr. Frazier saw Dr. Stevenson in the pre-operation area before his surgery but contends that when he saw Dr. Stevenson, Mr. Frazier was "medicated" and getting drowsy.  Id. at 23:83:5-84:2.

Plaintiffs contend that because of the surgery, Mr. Frazier "suffers with chronic pain syndrome within the setting of trigeminal neuralgia, front teeth numbness, persistent headaches, nasofacial pain episodes," and nosebleeds.  Dkt. No. 77 ¶¶ 16, 31.

On at least two occasions, on April 20, 2020, and October 26, 2020, Plaintiffs requested from Defendants copies of Mr. Frazier's medical records.  Dkt. No. 77 ¶¶ 126, 132.  Requests for medical records are handled by the Medical Records and Resource Management department.  Dkt. No. 83-3.  Plaintiffs contend that the medical records Defendants' produced in response to their requests were fabricated, incomplete, and not provided in the time required by Georgia law.  Dkt. No. 77 ¶¶ 100-13, 125-35.

In their second amended complaint brought against Defendants SGHS, Dr. Stevenson, and Cooperative Healthcare Services, Inc. (doing business as Southeast Georgia Physician Associates-Ear, Nose & Throat), Plaintiffs allege Defendants committed professional negligence, failed to acquire informed consent, committed fraud, and altered and fabricated portions of Mr. Frazier's medical records. Dkt. No. 77. Defendants now move for partial summary judgment on Plaintiffs' claims in two separate motions. Dkt. Nos. 181, 182. In the first motion, Defendants argue they satisfied the legal requirements for informed consent. Dkt. No. 181-1 at 14-25. In the second, Defendants argue Plaintiffs' claims under the Health Insurance Portability and Accountability Act of 1996 ("HIPPA") and O.C.G.A. § 31-33-2 ("Records Claims") fail as a matter of law, and that they are entitled to partial summary judgment on Plaintiffs' punitive damages claims. Dkt. No. 183 at 3-11.

**LEGAL STANDARD**

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" where the evidence would allow "a reasonable jury to return a verdict for the nonmoving party." FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986)).  A fact is "material" only if it "might affect the outcome of the suit under the governing law." Id. (quoting Anderson, 477 U.S. at 248).  Factual disputes that are "irrelevant or unnecessary" are not sufficient to survive summary judgment. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The movant must show the court that there is an absence of evidence to support the nonmoving party's case.  See id. at 325.

If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  See Anderson, 477 U.S. at 257. The nonmovant may satisfy this burden in one of two ways.  First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)).  Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117.  Where the nonmovant attempts to carry

this burden with nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

## DISCUSSION

### I.   **Defendants are entitled to summary judgment on Plaintiffs' Informed Consent claims.**

Defendants are entitled to summary judgment on Plaintiffs' informed consent claims because there is no genuine issue of material fact regarding Defendants' compliance with Georgia's informed consent statute. Dkt. No. 181-1 at 15-16. Plaintiffs insist Defendants failed to apprise Mr. Frazier of the information required by O.C.G.A. § 31-9.6.1(a) ("Informed Consent Statute") because Defendants' Informed Consent Form "does not meet the requirements under the Georgia informed consent law and Rules of Georgia Composite Medical Board at Chapter 360-14, including Exhibit (360-14) B." Dkt. No. 77 ¶¶ 69-80, 104.

As an initial matter, during a hearing before the Court, Plaintiffs conceded that Defendants' Informed Consent Form is consistent with the Informed Consent Statute. Dkt. No. 219. Accordingly, there is no genuine issue of material fact regarding the sufficiency of Defendants' Informed Consent Form.

Furthermore, Plaintiffs fail to show there is a genuine issue of material fact on their claim that Defendants failed to provide the Informed Consent Statute's required disclosures.

The Informed Consent Statute provides: "any person who undergoes any surgical procedure under general anesthesia, spinal anesthesia, or major regional anesthesia . . . must consent to such procedure and shall be informed in general terms of the following:

> (1) A diagnosis of the patient's condition requiring such proposed surgical or diagnostic procedure;
>
> (2) The nature and purpose of such proposed surgical or diagnostic procedure;
>
> (3) The material risks generally recognized and accepted by reasonably prudent physicians of infection, allergic reaction, severe loss of blood, loss or loss of function of any limb or organ, paralysis or partial paralysis, paraplegia or quadriplegia, disfiguring scar, brain damage, cardiac arrest, or death involved in such proposed surgical or diagnostic procedure which, if disclosed to a reasonably prudent person in the patient's position, could reasonably be expected to cause such prudent person to decline such proposed surgical or diagnostic procedure on the basis of the material risk of injury that could result from such proposed surgical or diagnostic procedure;
>
> (4) The likelihood of success of such proposed surgical or diagnostic procedure;
>
> (5) The practical alternatives to such proposed surgical or diagnostic procedure which are generally recognized and accepted by reasonably prudent physicians; and
>
> (6) The prognosis of the patient's condition if such proposed surgical or diagnostic procedure is rejected.

O.C.G.A. § 31-9-6.1(a).

The Informed Consent Statute "does not impose a general requirement of disclosure upon physicians; rather, it requires physicians to disclose only those factors listed." Blotner v. Doreika, 678 S.E.2d 80, 81 (Ga. 2009) (citing Albany Urology Clinic v. Cleveland, 528 S.E.2d 777, 780 (Ga. 2000)). There is no "common law duty to inform patients of the material risks of a proposed treatment or procedure" aside from what is explicitly required under the Informed Consent Statute. Id. at 80. Moreover, the Informed Consent Statute "must be strictly construed and cannot be extended beyond its plain and explicit terms," meaning there can be no "impermissibly expanded[,] . . . judicially-created[ ] duty of disclosure." Id. at 81.

The Informed Consent Statute provides for an action for medical malpractice, as defined in O.C.G.A. § 9-3-70, upon a showing:

> (1) That the patient suffered an injury which was proximately caused by the surgical or diagnostic procedure;
>
> (2) That information concerning the injury suffered was not disclosed as required by this Code section; and
>
> (3) That a reasonably prudent patient would have refused the surgical or diagnostic procedure or would have chosen a practical alternative to such proposed surgical or diagnostic procedure if such information had been disclosed; provided, however, that, as to an allegation of negligence for failure to comply with the requirements of this Code section, the expert's affidavit required by Code Section 9-11-9.1 shall set forth that the patient suffered an injury which was proximately caused by the surgical or diagnostic

procedure and that such injury was a material risk
required to be disclosed under this Code section.

O.C.G.A. § 31-9-6.1(d).

So, "[s]trictly construing section (d) of Georgia's informed
consent statute, the statute contemplates a cause of action based
on an injury from an undisclosed material risk of the procedure."
Callaway v. O'Connell, 44 F. Supp. 3d 1316, 1329 (M.D. Ga. 2014).
"This is apparent from reading subsection (d)(2), requiring an
injury resulting from information that was not disclosed, with the
requirement that an expert testify that such injury was caused by
a material risk required to be disclosed pursuant to subsection
(a)(3)." Id.

Further, the Informed Consent Statute enumerates the types of
material risks requiring disclosure. See O.C.G.A. § 31-9-
6.1(a)(3). So, if the Informed Consent Statute did not require
disclosure of the allegedly non-disclosed risks, then, plainly, a
failure to disclose them does not constitute a violation of the
Informed Consent Statute. See Callaway, 44 F. Supp. 3d at 1330
("If a fistula does not fall within this category, however, then
failure to disclose that risk cannot be the basis of an informed
consent claim because it is not one of the enumerated risks in the
statute."). Moreover, a claim based solely on the alleged failure
to disclose "practical alternatives" also fails as a matter of
law. Id. at 329-30.

Even assuming Plaintiffs' alleged non-disclosed risks fall into one of the enumerated material risks of the Informed Consent Statute, the record evidence does not show Defendants failed to disclose those required material risks.  The undisputed evidence shows that Mr. Frazier signed the Informed Consent Form that all agree complies with the Informed Consent Statute and that Mr. Frazier signed the Anesthesia Consent Form as well.  <u>See</u> Dkt. No. 181-16.

Defendants' Informed Consent Form states, in pertinent part,

(physician/practitioner) has discussed with me the reasons, anticipated benefits of this procedure/treatment, the probability of its success and the possible consequences of not having this procedure/treatment. I further understand that any operation or procedure and recuperation involve some risks and hazards. I have been made aware of the risks associated with this <u>particular</u> operation or procedure. This authorization is given with the understanding that the practice of medicine and surgery is not an exact science and no guarantees have been made to me by anyone as to the results of the procedure/treatment. I recognize that during the course of treatment(s) or procedure(s), unforeseen conditions may necessitate additional or different procedures or treatments than those set forth above[.] I, therefore, further authorize and request that my physician and the appropriate staff perform such procedures or treatments as are deemed necessary.

<u>Id.</u> at 2.  Defendants' Informed Consent Form also includes notices, including those for "surgical tasks," informing Plaintiffs that other surgeons and practitioners may be performing aspects of the surgery, SGHS's "tissue disposal" procedure, the requirement that "implants and devices [will be] implanted during the

operation/procedure," the "allograft consent" for use of donated bone or tissue products, and the acknowledgment of the use of and risks associated with "blood transfusion."  Id. at 2-3.

Defendants' Informed Consent Form concludes with a section titled "Patient Consent," which states,

> I acknowledge that I have had the opportunity to discuss my condition, proposed treatment, concerns or questions with my physician/practitioner, including risks, benefits and alternative treatments. I have been given enough information, have had my questions answered, have adequate knowledge to make an informed decision and wish to proceed with the proposed treatment/procedure.  I have read and understand this form and I voluntarily authorize and consent to the operation or procedure.

Id. at 3.

Moreover, Defendants' Anesthesia Consent Form explains that anesthesia is necessary for the underlying surgical procedure and describes the purpose and use of anesthesia generally and the method by which it would be administered during the procedure. Dkt. No. 181-16 at 4.  The Anesthesia Consent Form also defines the various types of anesthesia and outlines the "risks and complications" associated with using anesthesia, including, but "not limited to:"

> Allergic/adverse reaction, aspiration, backache, brain damage, coma, dental injury, headache, inability to reverse the effects of anesthesia, infection, localized swelling and/or redness, muscle aches, nausea, ophthalmic (eye) injury, pain, paralysis, pneumonia, positional nerve injury, recall of sound/noise/speech by others, seizures, sore throat, and death.

Id.

So, Defendants' Informed Consent Form states, in short, that Mr. Frazier, through his signature, understands that the elements of O.C.G.A. § 31-9-6.1 have been met.  As a result, under Georgia law, there is a rebuttable presumption of informed consent.  See O.C.G.A. § 31-9-6.1 ("If a consent to a diagnostic or surgical procedure is required to be obtained under this Code section and such consent discloses in general terms the information required in subsection (a) of this Code section, is duly evidenced in writing, and is signed by the patient or other person or persons authorized to consent pursuant to the terms of this chapter, then such consent shall be rebuttably presumed to be a valid consent.").

Moreover, Plaintiffs fail to identify any evidence in the record to support their argument that Mr. Frazier was already under anesthesia when he signed Defendants' Informed Consent Form.  Mr. Frazier's deposition testimony does not say any anesthesia or medication that affects his cognition was administered before Mr. Frazier signed the Informed Consent Form.  Instead, Mr. Frazier's deposition testimony shows that Nurse Faircloth at least showed Mr. Frazier the second page of the Informed Consent Form, which Mr. Frazier signed, and which Mr. Frazier contends was presented "to get medication -- to allow for her to give [Mr. Frazier] medication to bring [his] pulse rate down and help [Mr. Frazier] relax."  Dkt. No. 181-2 at 20:71:6-72:2.  Mr. Frazier further testified that he saw only the second page of Defendants' Informed

13

Consent Form and that, while he agrees he signed the second page, he says he did not read it because of Nurse Faircloth's representation to him that the second page of Defendants' Informed Consent Form was solely to allow her to administer "medication to bring [his] pulse rate down and to help [him] relax." Dkt. No. 181-2 at 20:71:16-72:4; see id. at 20-23. When asked whether Mr. Frazier recalls if Dr. Stevenson saw him before the operation and asked him if he had any questions, Mr. Frazier testified, "[a]t that point I was medicated and I was -- I remember getting drowsy. I remember him leaving out of the room because I thought to myself, well, certainly he's going to come back in and wake me up and let me speak with him." Id. at 23:83:5-84:2. The only other mention of anesthesia during Mr. Frazier's deposition is as follows:

> Q. Okay. After you got in the operating room, you were taken to the operating room, do you recall -- what do you recall? Let's ask it that way.
>
> A. After I was taken into the operating room I don't recall because I started drifting off and the -- I think I was drifting off by the time I got there.
>
> Q. Okay. So you believe you were given something to anesthetize you or start that process before you were taken into the operating room?
>
> A. Yes, sir.

Dkt. No. 181-2 at 24:90:4-14.

Mr. Frazier's deposition testimony does not show, as Plaintiffs argue, that he was provided with anesthesia before he signed Defendants' Anesthesia Consent Form and the second page of

Defendants' Informed Consent Form.  All Mr. Frazier's testimony
shows is that he believes he was "given something to anesthetize"
him before he was taken into the operating room.  Id.  It says
nothing about being given any anesthesia or other medication that
affects cognition before he signed either form.  Id.  Consequently,
Plaintiffs fail to support their contention that Mr. Frazier was
under anesthesia or medication when he signed either form.

     Finally, Plaintiffs' argument that Mr. Frazier saw only the
second page of Defendants' Informed Consent Form is insufficient
to show a genuine issue of material fact.  Under Georgia law, "[a]
consent to surgical or medical treatment which discloses in general
terms the treatment or course of treatment in connection with which
it is given and which is duly evidenced in writing and signed by
the patient or other person or persons authorized to consent
pursuant to the terms of this chapter shall be conclusively
presumed to be a valid consent in the absence of fraudulent
misrepresentations of material facts in obtaining the same."  See
Harris v. Tatum, 455 S.E.2d 124, 127 (Ga. Ct. App. 1995).  That
rebuttable presumption applies even where the signer claims they
did not read the consent form in full.  Winfrey v. Citizens & S.
Nat'l Bank, 254 S.E.2d 725, 727 (Ga. Ct. App. 1979) ("Because no
legally sufficient excuse appears, appellant is bound by the
consent document in spite of her failure to read it.");  Cf. Gill
Plumbing Co. v. Jimenez, 714 S.E.2d 342, 350 (Ga. Ct. App. 2011)

("One signing a document has a duty to read it and is bound by the terms of a document he does not read . . . . This is true even if the signer cannot read, because in that circumstance the signer has a duty "to procure some reliable person to read and explain it to him." (first quoting <u>Pioneer Concrete Pumping Serv. v. T & B Scottsdale Contractors</u>, 462 S.E.2d 627 (Ga. Ct. App. 1995) (citation and punctuation omitted), and then quoting <u>Brewer v. Royal Ins. Co. of Am.</u>, 641 S.E.2d 291 (Ga. Ct. App. 2007) (citation and punctuation omitted))).

Notably, the top right corner of the second page of Defendants' Informed Consent Form—bearing Mr. Frazier's signature—reads "SOUTHEAST GEORGIA HEALTH SYSTEM CONSENT FOR PROCEDURE Pg 2 of 2." Dkt. No. 181-16 at 3. Therefore, Mr. Frazier contends, at best, that he overlooked the inscription indicating he was signing the second page of the Informed Consent Form. Even taken in the light most favorable to Plaintiffs, that Mr. Frazier did not see the first page is due to his own oversight. <u>Winfrey</u>, 254 S.E.2d at 727.

Plaintiffs concede Defendants' Informed Consent Form lines up with statutory requirements. What's more, Mr. Frazier signed both the Informed Consent Form and the Anesthesia Consent Form. <u>See</u> Dkt. No. 181-16. So, without any legal excuse, Plaintiffs are bound by the signed Informed Consent and Anesthesia Consent Forms despite Mr. Frazier's own failure to read the former in full.

Accordingly, Defendants are entitled to summary judgment on Plaintiffs' claims in Counts I and VI, and portions of Counts III, IV, V, and IX filed pursuant to the Georgia Informed Consent Statute.

## II. Defendants are entitled to summary judgment on Plaintiffs' Records Claims.

Defendants contend Plaintiffs' Records Claims (Counts VI, VII, VIII,[1] X, XI, and XII) fail as a matter of law because neither HIPAA nor O.C.G.A. § 31-33-2 "creates or supports a private cause of action." Dkt. No. 220 at 2.

### A. HIPAA

As an initial matter, to the extent Plaintiffs allege HIPAA violations, those claims necessarily fail because there is no private right of action under HIPAA.[2] Laster v. CareConnect Health Inc., 852 F. App'x 476, 478 (11th Cir. 2021); Meadows v. United Servs., Inc., 963 F.3d 240, 244 (2d Cir. 2020); Crawford v. City

---

[1] In their partial motion for summary judgment, dkt. no. 182, Defendants list "Count VII" twice. Clearly Defendants intended to include Count VIII which is titled "Fraudulent Medical Records and Constructive Fraud on 2/25/2020." Dkt. No. 77 at 23. All Parties have proceeded as such, and the Court will as well.

[2] The second amended complaint appears to allege violations of HIPAA. See, e.g., Dkt. No. 77 at 25 (Count X); see also id. at 26 (Count XI). However, in their briefing, Plaintiffs explain, "[t]he Health Records statutes at issue in O.C.G.A. §§[ ]31-33-2 and 31-33-5 references [sic] HIPAA, which is why it is cited in the operative Complaint. The Fraziers' records allegations are based on the Georgia statutes identified above in Title 31, Chapter 33." Dkt. No. 202 at 1.

of Tampa, 397 F. App'x 621, 623 (11th Cir. 2010); Sneed v. Pan Am. Hosp., 370 F. App'x 47, 50 (11th Cir. 2010); Acara v. Banks, 470 F.3d 569, 572 (5th Cir. 2006).

To the extent Plaintiffs seek to hold Defendants liable under O.C.G.A. § 51-1-6 for a breach of legal duty under HIPAA, that claim also fails.  Under O.C.G.A. § 51-1-6,

> When the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby.

However, O.C.G.A. § 51-1-6 "does not give rise to a private cause of action unless the statutes outlining the legal duty provide for a civil remedy."  Barbara v. Meeks, No. 1:20-cv-4422-AT, 2021 WL 2274457, at *5 (N.D. Ga. Apr. 30, 2021) (citing Reilly v. Alcan Aluminum Corp., 528 S.E.2d 238 (Ga. 2000) (employee cannot sue his employer under O.C.G.A. § 51-1-6 where the statute creating the legal duty does not provide a civil right of action)).  To the contrary, HIPAA creates no civil remedy, so O.C.G.A. § 51-1-6 cannot salvage these claims.  See Scoggins v. Floyd Healthcare Mgmt. Inc., No. 414CV00274HLMWEJ, 2016 WL 11544908, at *27 (N.D. Ga. Aug. 30, 2016) ("Plaintiff's negligence per se claim fails as a matter of law, because HIPAA does not provide a civil remedy and, under Georgia law, a plaintiff may not pursue a negligence per se claim under O.C.[G.A.] § 51-1-6 if the statute or regulation that supposedly gives rise to the legal duty does not provide a

civil remedy."). Accordingly, Defendants are entitled to summary judgment on Plaintiffs' HIPAA claims.

**B. O.C.G.A. §§ 31-33-2 and 31-33-5**

Plaintiffs' claims under O.C.G.A. §§ 31-33-2 and 31-33-5 of the Georgia Health Records Act likewise fail.

Plaintiffs contend Defendants are liable for various alleged violations of O.C.G.A. § 31-33-2 by: (1) failing to provide complete medical documentation within thirty days of Plaintiffs' request on two occasions; (2) providing to Plaintiffs and utilizing in this suit records with "fabricated" dates of service; (3) "refusing to document" details of the removal of the packing/gauze and blood clots; and (4) stating during a May 2020 visit that no request for records was received despite a request sent in "March/April 2020." Dkt. No. 77 ¶ 65(f), ¶¶ 100-106 (Count VI), ¶¶ 107-113 (Count VII), ¶¶ 114-121 (Count VIII) ¶¶ 125-29 (Count X), ¶¶ 130-35 (Count XI), ¶¶ 136-37 (Count XII). Defendants, on the other hand, insist there is no private right of action under O.C.G.A. § 31-33-2, and that, in the alternative, they are entitled to immunity from civil liability. Dkt. No. 183 at 5-11.

O.C.G.A. § 31-33-2 governs the conditions and procedures for copying medical records. "It is, of course, fundamental that 'the cardinal rule to guide the construction of laws is, first, to ascertain the legislative intent and purpose in enacting the law, and then to give it that construction which will effectuate the

19

legislative intent and purpose.'" <u>City of Jesup v. Bennett</u>, 176 S.E.2d 81, 82-83 (Ga. 1970) (quoting <u>Ford Motor Co. v. Abercrombie</u>, 62 S.E.2d 209, 213 (Ga. 1950)).

Georgia courts have explained that the intent of the legislature in enacting the Health Records Act "was to ensure that patients have access to medical records in the custody and control of health care providers without being charged more than the reasonable costs of copying and mailing them." <u>Cotton v. Med-Cor Health Info. Sols., Inc.</u>, 472 S.E.2d 92, 95 (Ga. Ct. App. 1996).

Accordingly, O.C.G.A. § 31-33-2 requires "provider[s] having custody and control" of certain medical records to retain those records for a minimum of ten years from the date the record was created. O.C.G.A. § 31-33-2(a)(1)(A). O.C.G.A. § 31-33-2 further mandates, in pertinent part,

> (2) Upon written request from the patient or a person authorized to have access to the patient's record . . . the provider having custody and control of the patient's record shall furnish a complete and current copy of that record, in accordance with the provisions of this Code section. . . .

> (b) Any record requested under subsection (a) of this Code section shall within 30 days of the receipt of a request for records be furnished to the patient. . . .

> (e) Any provider or person who in good faith releases copies of medical records in accordance with this Code section shall not be found to have violated any criminal law or to be civilly liable to the patient, the deceased patient's estate, or to any other person.

O.C.G.A. § 31-33-2.

So, O.C.G.A. § 31-33-2 addresses a provider's obligation to furnish records within thirty days of the receipt of a request from an authorized person.  Moreover, O.C.G.A. §§ 31-33-2(e) and 31-33-5 protect providers who in good faith release copies of medical records pursuant to the statute's requirements from criminal and civil liability "to the patient, guardian, parent, or any other person for such release."  Furthermore, the Georgia Health Records Act makes a violation of any of its provisions a misdemeanor.  O.C.G.A. § 31-5-8.  Clearly, there is no civil remedy provided.

Under Georgia law,

> [C]ivil liability may be authorized where the legislature has indicated a strong public policy for imposing a civil as well as criminal penalty for violation of a penal statute[,] . . . the indication that the legislature meant to impose a civil as well as criminal penalty must be found in the provisions of the statute at issue, not extrapolated from the public policy the statute generally appears to advance.

Anthony v. Am. Gen Fin. Servs. Inc., 697 S.E.2d 166, 172 (Ga. 2010).  In Murphy v. Bajjani, the Supreme Court of Georgia explained,

> There is no indication that the legislature intended to impose civil liability in addition to the criminal sanctions set forth in a statute where, as here, nothing in the provisions of the statute creates a private cause of action in favor of the victim purportedly harmed by the violation of the penal statute. Troncalli v. Jones, 237 Ga. App. 10(1), 514 S.E.2d 478 (1999) (enactment of criminal stalking statute did not create a tort of stalking); Vance v. T.R.C., 229 Ga. App. 608(1)(a), 494 S.E.2d 714 (1997); Cechman v. Travis, 202 Ga. App.

21

255(1), 414 S.E.2d 282 (1991) (penal statute requiring report of suspected child abuse does not create a private cause of action in tort in favor of child whose abuse was not reported). While [O.C.G.A.] § 20-2-1184 establishes Georgia's public policy concerning the need to report timely to the appropriate authorities the identity of students who commit certain proscribed acts on school grounds, it does not create a civil cause of action for damages in favor of the victim or anyone else for the purported failure to report timely.

647 S.E.2d 54 (Ga. 2007); Compare Chisolm v. Tippens, 658 S.E.2d 147, 152-53 (Ga. Ct. App. 2008) (statute prohibiting school systems from denying parents the right to inspect and review child's educational records contains no provision creating a private cause of action for parents who are denied access to such educational records) with Williams v. DeKalb Cnty., 840 S.E.2d 423, 433 (Ga. 2020) (finding language in the Open Meetings Act stating the Attorney General's enforcement authority was "in addition to any action that may be brought by any person," contemplated a private cause of action to enforce the Act).[3]

A broader look at the Georgia Health Records Act strengthens the conclusion that civil liability is not contemplated.  The relevant provisions of the Georgia Health Records Act are O.C.G.A. §§ 31-33-2, 31-33-5, 31-5-8, and 31-5-9.  O.C.G.A. § 31-33-5 states, "[a]ny provider releasing information in good faith

---

[3] Compare O.C.G.A. §§ 31-33-2, 31-33-5 with Ellison v. Southstar Energy Servs., LLC, 679 S.E.2d 750, 754-55 (Ga. Ct. App. 2009) (citing Cotton, 472 S.E.2d 92 (addressing O.C.G.A. § 31-33-2, a statute with no private right of action, as compared to the Gas Act which does provide a private right of action)).

pursuant to the provisions of this chapter shall not be civilly or criminally liable to the patient, guardian, parent, or any other person for such release."  That same title, in its "Administration and Enforcement" chapter, O.C.G.A. § 31-5-8, states, "[a]ny person violating the provisions of this title shall be guilty of a misdemeanor, provided that this Code section shall not apply to violations of the provisions of Chapter 20, 22, or 24 of this title."  O.C.G.A. § 31-5-9(a) also empowers "[t]he Department of Public Health and all county boards of health and the Department of Community Health" to seek injunctive relief to enjoin "violation[s] of any provision of this title as now existing or as may be hereafter amended or of any regulations or order duly issued by the department, any county board of health, or the Department of Community Health," as well as "to abate any public nuisance which is injurious to the public health, safety, or comfort." O.C.G.A. § 31-5-9(a) further provides, "[s]uch actions may be maintained notwithstanding the fact that such violation also constitutes a crime and notwithstanding that other adequate remedies at law exist."

True, the text and structure of the Georgia Health Records Act make it clear that a private cause of action for civil damages is prohibited.  But there is more.  The legislature clearly knows how to provide a private cause of action for civil damages if it wants to do so.  It has done so in other contexts.  See e.g.,

O.C.G.A. § 31-8-126(a) (providing "[a]ny person or persons aggrieved because a long-term care facility has violated or failed to provide any right granted under this article shall have a cause of action against such facility for damages and such other relief as the court having jurisdiction of the action deems proper. No person shall be prohibited from maintaining such an action for failure to exhaust any rights to administrative or other relief granted under this article"); O.C.G.A. § 31-8-136(a) (providing, alongside the Attorney General's enforcement power, that "[a]ny resident or the representative or legal surrogate of the resident, if any, may bring an action in a court of competent jurisdiction to recover actual and punitive damages against a personal care home or its governing body, administrator, or employee for any violation of the rights of a resident granted under this article").

In a last-ditch effort to find some authorization for civil liability, Plaintiffs point to § 31-33-2(e) which, again, provides,

> (e) Any provider or person who in good faith releases copies of medical records in accordance with this Code section shall not be found to have violated any criminal law or to be civilly liable to the patient, the deceased patient's estate, or to any other person.

By its terms, that subsection makes it clear that no one who overshares—that is releases records in good faith even when such records shouldn't be released—will be subject to liability of any kind. Of course, in this case, the Court is not tasked with

24

deciding whether anyone should be punished for releasing medical records when no release was warranted.[4]

Accordingly, Defendants are entitled to summary judgment on Plaintiffs' Records Claims (Counts VI, VII, VIII, X, XI).

---

[4] Plaintiffs appear to be attempting to force the proverbial square peg into the proverbial round hole.  They insist that their allegation of a "fabricated" or "fraudulent" medical record is sufficient to show bad faith under this statute.  However, O.C.G.A. § 31-33-2 makes no mention of fabricated or fraudulent medical records.  Instead, it provides a pathway for patients to receive copies of their records within the required time and at a reasonable price.  The immunity provided thereunder is for the good faith release of records pursuant to those requirements.  Under Georgia law, a fraud claim is a separate and independent claim that Plaintiffs did not raise.  O.C.G.A. § 9-11-9(b) ("In all averments of fraud or mistake, the circumstance constituting fraud or mistake shall be stated with particularity.").  Moreover, while Plaintiffs do not make this argument, their claims under Counts VI, VII, and VIII are insufficient to stand alone as claims for fraud.  The elements of a Georgia fraud claim are: "a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff." Roberts v. Nessim, 676 S.E.2d 734, 739 (Ga. Ct. App. 2009) (quoting Johnson v. Rodier, 529 S.E.2d 442 (2000)).  Plaintiffs fail to appreciate the specificity with which a fraud claim must be pled, and instead lump the term "fraudulent" in with their informed consent and records claims. See e.g., Dkt. No. 77 ¶¶ 100-106 (Count VI titled "Fraudulent/Altered Medical Record and Constructive Fraud on 1/21/2020" alleging Defendants "represented and wrote down" the date and time on the Informed Consent Form "without Mr. Frazier's permission," despite Plaintiffs' allegations that Mr. Frazier did not see the first page of the Informed Consent Form and that Defendants did not meet the requirements of the Informed Consent Statute); See also Dkt. No. 202 at 1 (stating Plaintiffs' "records allegations are based on" O.C.G.A. §§ 31-33-2 and 31-33-5); id. at 3 (arguing O.C.G.A. § 31-33-1 imposes liability on Defendants for releasing "alleged fraudulent records," and that in that circumstance, O.C.G.A. § 31-33-5's immunity provision does not apply).

**C. Defendants' Immunity from Punitive Damages Claims**

Defendants SGHS and Cooperative Healthcare Services, Inc. contend they "are related entities doing business in association with the Hospital Authority," which warrants summary judgment in their favor on Plaintiffs' punitive damages claims. See Dkt. No. 183 at 11 (citing Dkt. Nos. 46, 48, 49); Dkt. No. 48 (Defendant Cooperative Healthcare Services, Inc. listing "Defendant Southeast Georgia Health System, Inc." under its "list of officers, directors, or trustees").

Under Georgia law, public hospitals cannot be held liable for punitive damages. See Hosp. Auth. of Clarke Cnty. v. Martin, 438 S.E.2d 103 (Ga. Ct. App. 1993), aff'd, Martin v. Hosp. Auth. of Clarke Cnty., 449 S.E.2d 827 (Ga. 1994) (holding hospital authorities cannot be held liable for punitive damages because they are government entities); see also Crisp Reg'l Nursing & Rehab. Ctr. v. Johnson, 574 S.E.2d 650, 655 (Ga. Ct. App. 2002) (same). In Crisp, the court granted summary judgment to the hospital-defendants where the hospital's administrator "testified that the Hospital Authority of Crisp County does business as Crisp Regional Health Care Systems, Inc., and that Crisp Regional Nursing & Rehabilitation Center is part of Crisp Regional Health Care Systems." Id.

Here, record evidence shows that "effective May 1, 2015," the Glynn-Brunswick Memorial Hospital Authority ("Hospital Authority")

26

executed a lease and transfer agreement pursuant to which Defendant Southeast Georgia Health System, Inc. "assumed substantially all of the operations, assets, and liabilities of the Hospital Authority and agreed to operate as a community healthcare provider." Dkt. No. 220-1 at 4; Id. at 6-55 (Lease and Transfer Agreement between Glynn-Brunswick Memorial Hospital Authority and SGHS); Id. at 56-113 (Bylaws of the Hospital Authority); Id. at 114-22 (SGHS Articles of Incorporation); Id. at 123-48 (SGHS Bylaws); Id. at 171-249 (Amended and Restated Master Trust Indenture between Hospital Authority, SGHS, Cooperative Healthcare Services, Inc., SGHS Holdings, Inc., and U.S. Bank National Association, Inc.).

The record further shows that Defendant SGHS is Defendant Cooperative Health Services' "sole corporate member," and Defendant Cooperative Health Services' "function is the operator of physician practices on behalf of" Defendant Southeast Georgia Health System. Id. at 4-5; Id. at 149-58 (Cooperative Healthcare Services Certificate and Articles of Incorporation); Id. at 159-70 (Cooperate Healthcare Services Bylaws). Accordingly, Defendant Cooperative Healthcare Services' "functions are primarily billing and administrative," and it "has no employees," because Defendant SGHS "employs both the professional and non-professional staff who work at [Cooperative Healthcare Services] physician practices including Southeast Georgia Physician Associates – Ear Nose and

Throat." Id. at 5.  Moreover, "Sherman A. Stevenson, M.D. has never been an employee of [Cooperative Healthcare Services] but has instead been an employee of [SGHS] at all times during his treatment of Mr. Frazier to the present." Id. at 5.

The record clearly shows that the Hospital Authority does business as SGHS, and Cooperative Healthcare Services is part of SGHS.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' punitive damages claims (Count XII).

**CONCLUSION**

For the foregoing reasons, Defendants' motions for partial summary judgment, dkt. nos. 181, 182, are **GRANTED**.  Accordingly, Plaintiffs' Informed Consent Claims (Counts I, VI, and portions of Counts III, IV, V, and IX), Records Claims (Counts VI, VII, VIII, X, and XI), and Punitive Damages Claims (Count XII) are **DISMISSED with prejudice**.  Counts II, III, IV, V, and IX remain pending. The parties are **ORDERED** to file their proposed consolidated pretrial order by Monday, October 23, 2023.  Further, a pretrial conference will be held on Monday, November 6, 2023 at 2:30 p.m. and a jury trial will be held on Tuesday, January 16, 2024, both at the federal courthouse in Brunswick, Georgia.

**SO ORDERED**, this 31st day of August, 2023.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA