## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

CEDRICK FRAZIER, and TAMARA
FRAZIER,

         Plaintiffs,

   v.

SOUTHEAST GEORGIA HEALTH
SYSTEM, INC., et al.,

        Defendants.

CIVIL ACTION NO.: 2:21-cv-21

## <u>REPORT AND RECOMMENDATION</u>

Defendants filed a "Motion for Dismissal Sanctions." Doc. 184. The Motion is fully briefed. Docs. 194, 208. The Court held a hearing on the Motion on September 18, 2023, where the parties were permitted to present evidence and argument. Doc. 247. For the following reasons, I **RECOMMEND** the Court **GRANT** Defendants' Motion and **DISMISS with prejudice** Plaintiffs' Complaint.

## INTRODUCTION

This Report concerns a video Plaintiffs offer as evidence of Defendant Dr. Stevenson's malpractice. Plaintiff Cedric Frazier testified under oath he recorded the video during a follow-up exam in Dr. Stevenson's medical offices. According to Mr. Frazier, just before he started recording the video, Dr. Stevenson removed several foreign objects from Mr. Frazier's nasal passage—objects Dr. Stevenson had negligently left in Mr. Frazier's nasal passage nearly a month earlier. The video depicts Plaintiff in a medical exam room and bloody items in a medical dish on the exam room counter.

Defendants contend the video is fake.  Defendants insist the video could not have been recorded in any of Defendants' exam rooms and it was not recorded during the follow-up exam. Defendants maintain Dr. Stevenson did not improperly leave any foreign items in Mr. Frazier's nasal passage or remove such items during the follow-up exam.

Two observations about this dispute: First, the importance of the video cannot be overstated.  Other than the video and Plaintiffs' testimony about the follow-up exam, it appears there is very little evidence showing Dr. Stevenson left foreign objects in Mr. Frazier's nasal passage or removed such items.  Second, there is no "middle ground."  Either Plaintiffs manufactured the video, which would likely require staging the scene and creating fake, bloody foreign items, or Defendants carried out an elaborate scheme to discredit the video, which would likely involve Defendants renovating their exam rooms and then covering up that work.  The parties do not offer any other plausible explanation.  There is no indication Plaintiffs are mistaken about where or when the video was recorded.  There is no indication Defendants are mistaken about where the follow-up exam occurred.  The only explanation is one side is being dishonest.

Ultimately, I conclude Defendants have demonstrated the video was not recorded where and when Plaintiffs claim it was recorded.  The implication of this conclusion is that Plaintiffs manufactured the video.  The Report proceeds as follows.  First, I summarize relevant background information, the parties' written submissions, and evidence introduced at a hearing on Defendants' Motion.  I then analyze the record and propose findings of fact.  Based on my proposed findings of fact, I conclude Plaintiffs willfully fabricated the video evidence in bad faith.  I conclude dismissal with prejudice is an appropriate sanction.

**BACKGROUND**

This case primarily concerns alleged medical malpractice.  Defendant Dr. Stevenson, an employee of Defendant Southeast Georgia Health System, Inc. ("SGHS"), performed a septoplasty and inferior turbinate reduction on Mr. Frazier on January 21, 2020.  Doc. 77 at 4. Plaintiffs allege Dr. Stevenson left gauze or packing in Mr. Frazier's nasal cavity for weeks after the procedure.  Id.  Plaintiffs allege Dr. Stevenson did not remove the foreign items from Mr. Frazier's nasal cavity until a follow-up exam on February 25, 2020.  Plaintiffs claim Dr. Stevenson's action caused Mr. Frazier serious pain and injury.  Defendants deny Dr. Stevenson left any gauze or packing in Mr. Frazier's nasal cavity.

The Motion now before the Court concerns one piece of disputed evidence—a short video that Mr. Frazier claims to have recorded during the February 25, 2020 exam visit. Therefore, this Background section provides a description of the video, a brief history of the dispute about the video, and a summary of the materials the parties submitted to the Court in support of or in opposition to Defendants' Motion.

**I.      The "YouCut Video"**

The disputed video (the "YouCut Video") is eight seconds long and vertically oriented, consistent in appearance with a video recorded using a cellphone.[1]  Doc. 53, Ex. I.  Generally speaking, the video depicts Mr. Frazier in what appears to be a medical examination room and bloody materials in a kidney basin.  Mr. Frazier is the only individual visible in the YouCut Video, though Mrs. Frazier's voice may be heard.  Dr. Stevenson does not appear in the video.

---

[1]      As explained below, the parties agree the disputed video was made using an application called YouCut.  At the hearing on Defendants' Motion, the parties generally referred to the video as the "YouCut Video."  The Court uses the same term here.

The YouCut Video begins with a full frame shot of Mr. Frazier's face looking into the camera, as if shot with a self-facing camera. A piece of pink material protrudes from Mr. Frazier's right nostril. The material appears to be gauze, cloth, or paper. The material extends from the inside of Mr. Frazier's nose to just above his upper lip. Mr. Frazier is wearing a collared shirt and a sweater or blazer. It appears the camera is aimed up at Mr. Frazier's face from slightly below his face. The video depicts Mr. Frazier, the wall behind Mr. Frazier, and the ceiling above Mr. Frazier. In the ceiling, there is a bright, rectangular, fluorescent-style light. Square white or off-white ceiling tiles and the corner of a square-shaped ceiling vent are visible. A plain white or off-white wall is visible behind Mr. Frazier. While looking into the camera, Mr. Frazier whispers, "What's this?"

At about the five-second mark, the camera's orientation changes. The orientation change is consistent with a change from a front-facing cellphone camera to a rear-facing cellphone camera. Once the orientation changes, the video begins depicting a close-up view of an off-white or beige countertop. The front of the counter is partially visible, along with part of a metallic handle for a drawer or cabinet. There is a gray-blue, kidney-shaped plastic basin on the countertop. The basin is filled with multiple bloody items. There are at least two different types of blood-soaked materials in the basin. On the countertop behind the basin, there are two bottles or containers and an open box of what appears to be blue latex gloves. The video ends just as someone's hand comes into the frame and begins to lift the basin off the countertop.

The YouCut Video is not an original recording, but is, instead, an eight-second edited and saved version of an original recording or recordings. Doc. 53 at 10. The parties all agree Mr. Frazier created the YouCut Video using an editing application named YouCut.

## II.     History of the Dispute Concerning the YouCut Video

Plaintiffs produced the YouCut Video on or about July 15, 2021.  Almost immediately after the video was produced, Defendants began asserting challenges and objections.  Id. at 6.  Defendants demanded Plaintiffs produce the original video files used to create the YouCut Video in an original format with all original metadata.  Id.  In response to Defendants' complaints, Plaintiffs produced more evidence, including at least one other video, but never produced the complete, original video files used to create the YouCut Video.  Defendants contacted the Court and asked for assistance with the dispute.

The Court held a telephonic status conference about the dispute on August 13, 2021.  Doc. 52.  No resolution was reached during the conference, but the Court authorized Defendants to file a motion to compel related to the YouCut Video dispute.

Immediately after the conference, Plaintiffs produced a screenshot image from Mr. Frazier's cellphone ("Screenshot 1").  Doc. 53 at 2.  Screenshot 1 appears to contain information—or metadata—about one of the original video files used to create the YouCut Video, including the file name, file size, and modified date.  Notably, the original video described in Screenshot 1 was not produced.[2]

Defendants then filed a motion to compel, asking the Court to order Plaintiffs to provide Mr. Frazier's cellphone to Defendants' forensic expert for imaging and examination.  Doc. 53.  Plaintiffs opposed the motion to compel and any request for forensic inspection by Defendants' expert.  Doc. 54.  In support of their opposition, Plaintiffs provided a short opinion about the

---

[2]      As explained in more detail below, two screenshots were eventually identified (Screenshot 1 and Screenshot 2).  The screenshots are important.  Plaintiffs contend the screenshots show the original video files were, in fact, recorded on February 25, 2020.  Plaintiffs contend this supports their position on the authenticity of the YouCut Video.  Defendants contend the screenshots are additional evidence of Plaintiffs' fabrication of the original video file.

video from their own video forensics and image analysis expert, Jim Stafford.  Doc. 54-1.  Mr. Stafford opined the YouCut Video is authentic.  Plaintiffs did not produce any original video files.  Plaintiffs stated Mr. Frazier would "testify under oath that various original files may have been corrupted and now unable to be located[]" but provided little explanation for how the corruption or deletion might have occurred.  Doc. 54 at 6.  Plaintiffs maintained they searched for the original video files that were used to make the YouCut Video but could not find them.

The Court granted Defendants' motion to compel and ordered Plaintiffs to provide Mr. Frazier's cellphone to Defendants' mobile device forensics expert, Vicente Rosado, so Mr. Rosado could attempt to find the original video file or files and related metadata.  Doc. 58. Plaintiffs complied with the Court's Order.  Mr. Rosado imaged and examined Mr. Frazier's cellphone and produced a report.  Doc. 184-1.  Mr. Rosado did not locate the original video file or files.  Mr. Rosado concluded he could not determine whether the YouCut Video was authentic, and he offered explanations about how metadata associated with the YouCut Video and Screenshot 1—specifically, the date and time of those items—could have been altered.

Around the same time Defendants filed their motion to compel, in August 2021, Plaintiffs filed a motion asking to inspect Dr. Stevenson's office, the Southeast Georgia Physician Associates-Ear Nose and Throat ("SPGA-ENT") office (referred to in this Report as "Suite 480").  Doc. 55.  Plaintiffs asked to have a videographer present during the inspection.  The Court granted Plaintiffs' request and allowed the inspection to go forward.  Doc. 64.  Plaintiffs conducted their inspection of Suite 480 on October 5, 2021.  Plaintiffs and Defendants both had their own videographers present for the inspection.

In December 2021, Plaintiffs filed their Second Amended Complaint, and in that pleading, Plaintiffs expressly rely on the YouCut Video.[3]  Doc. 77 at 9, 23.  Plaintiffs allege the YouCut Video was recorded in Suite 480 on February 25, 2020, and the video shows the foreign objects Dr. Stevenson left in Mr. Frazier's nasal cavity and later removed.

Defendants have at various times questioned the authenticity of the YouCut Video, but on those occasions, Defendants failed to present any direct challenge to the video.  For example, earlier in this litigation Defendants moved for summary judgment on various grounds, including lack of subject matter jurisdiction.  In January 2022, Defendants filed a reply brief in support of that motion for summary judgment.  Doc. 91.  Defendants tacked on a few paragraphs to the end of that reply brief describing the YouCut Video, the forensic inspection, and inspection of the SPGA-ENT offices.  Id. at 22–24.  Defendants then alleged the YouCut Video "was not and could not have been recorded [in Suite 480] because physical characteristics of the room shown in [the YouCut Video] do not match multiple physical characteristics of [Suite 480] that have not changed since its build-out in 2012."  Id. at 25.  The authenticity of the YouCut Video was not germane to the issues Defendants raised in their motion for summary judgment, so it played no role in resolution of the motion.  Doc. 131.

Defendants raised a similar, tangential challenge to the YouCut Video in a footnote in a brief concerning Plaintiff's request for a stay of discovery.  Doc. 124 at 2 n.1.  The challenge was irrelevant to the issue before the Court, so it did not factor into the Court's analysis.  Doc. 125.

In October 2022, Plaintiffs tried to amend their Complaint again.  Doc. 146.  Defendants opposed that attempt, and in their response, argued the YouCut Video could not have been

---

[3]     There is no mention of any video recording in Plaintiffs' original Complaint, doc. 1, filed in February 2021 or in Plaintiffs' First Amended Complaint, doc. 36, filed in June 2021.

recorded in Suite 480.  Doc. 149 at 3 n.3.  Again, Defendants' challenge was not germane to the issue before the Court—whether Plaintiffs should be allowed to amend—so the authenticity of the YouCut Video played no role in the resolution of that dispute.  Doc. 178.  The Court ultimately denied Plaintiffs' request to amend.[4]

Defendants directly challenged the YouCut Video for the first time when they filed the instant Motion in March 2023.  Doc. 184.  Defendants argue Plaintiffs fraudulently manufactured the YouCut Video.  Defendants contend the video could not have been recorded in Suite 480.  Id. at 2.  Defendants argue the room shown in the YouCut Video is entirely inconsistent with the physical appearance of the exam rooms in Suite 480, and the Suite 480 exam rooms have not been changed in any material way since long before February 25, 2020.  Defendants rely on various pieces of evidence to support this argument, including the testimony of two people who are familiar with Suite 480: Dr. Stevenson and Shawn Crosby.  Mr. Crosby works at SGHS in facilities management.  Defendants also provide a video of the Suite 480 exam rooms recorded during the site inspection on October 5, 2021.  Defendants also argue their position is supported by opinions and reports from the parties' forensics experts.

## III.    Party Submissions Related to the Dispute

The parties rely on a witness testimony, expert reports, and documents produced in discovery in support of or in opposition to the instant Motion.  The Court held a hearing on the Motion on September 18, 2023, where the parties offered additional evidence.  In this section, I describe all relevant materials.  For witness testimony described in this section, I simply

---

[4]      Defendants also obliquely challenged the YouCut Video in a response brief to a motion to compel Plaintiffs filed.  Doc. 164 at 4 n.4.  That challenge was irrelevant to the issue before the Court.  Doc. 222.

summarize material portions of the testimony but do not accept or reject any of it based on credibility.

A.    **Fact Witnesses**

        *1.    Mr. Frazier.*

Mr. Frazier testified at a deposition on October 5, 2021, doc. 65-1, and at the September 18, 2023 hearing.  Mr. Frazier's hearing testimony was substantially the same as his deposition testimony.  Several portions of his hearing testimony were nearly identical to his deposition testimony.

Mr. Frazier went to Suite 480 on February 25, 2020, for a scheduled post-operation visit with Dr. Stevenson.  Id. at 32.  Mrs. Frazier joined him.  Id. at 33.  Mr. and Mrs. Frazier both entered an exam room in Suite 480, and Mr. Frazier sat down in an exam chair.  Id.  Mr. Frazier could not recall in which of the three exam rooms he was.  Id. at 9.  Dr. Stevenson spoke with Mr. Frazier about his time away from work, his blood pressure, his pain symptoms, and his pain medicine.  Id.  at 33.  Mr. Frazier stated to Dr. Stevenson, "[W]ould you please just humor me and look inside my nose because I feel like there's something in there."  Id.

Dr. Stevenson examined Mr. Frazier.  Dr. Stevenson looked inside Mr. Frazier's nose with a light.  Id.  Dr. Stevenson told Mr. Frazier, "I see some—one of the stiches didn't dissolve."  Id.  Dr. Stevenson "started probing" the right side of Mr. Frazier's nose "and then [Dr. Stevenson] kind of stopped and he said I'll be right back."  Id.  Dr. Stevenson left the room and came back with more instruments.  Id.  Using an instrument "that was a little bit longer" than the first instrument, Dr. Stevenson continued to probe Mr. Frazier's nose.  Id.  Mr. Frazier testified:

> And I remember feeling something wet come down my lip at that point and he
> was snipping and it hurt and then he started pulling stuff out.  And I remember I

> felt—I thought, well, this must be my nose is bleeding or whatever.  And I
> remember I felt something cold and wet and it was just there on my lip.  And I
> remember I felt it touching me and I just—I looked down and he said hold still.
> And then he cut some, he went and pulled some more.  Then he said I'll be right
> back.

Id.  Dr. Stevenson left the room a second time.  Dr. Stevenson returned with "some kind of tray" and began placing pieces or shreds of gauze on it he had removed from Mr. Frazier's nose.  Id.  Dr. Stevenson removed "a lot of gauze" and then "blood clots were coming out . . . ."  Id.  Mr. Frazier told Dr. Stevenson, "I'm about to throw up," so Dr. Stevenson handed Mr. Frazier a piece of four-by-four gauze.  Id.  Dr. Stevenson also put a piece of four-by-four gauze on Mr. Frazier's shoulder.  Dr. Stevenson placed some of the material from Mr. Frazier's nose on the gauze.  Id.  Mr. Frazier started spitting up blood clots onto the gauze in his hand.  Dr. Stevenson handed Mr. Frazier a "kidney dish basin," and Mr. Frazier began spitting up into the basin.  Id.

While Dr. Stevenson was removing material from Mr. Frazier's right nostril, Mr. Frazier yelled in pain.  He told Dr. Stevenson, "I feel like you're about to pull out my left eyeball."  Id. at 33–34.  Dr. Stevenson looked into the left side of Mr. Frazier's nose, "and [Dr. Stevenson] looked and he was like oh, no."  Id. at 34.  Dr. Stevenson left the room for a third time.  Id.  When Dr. Stevenson returned, he "repeated the same thing [on the left side] and starts, you know, repeating the same thing snipping, pulling, cutting some off, pulling some more, looking back up there, pulling some more."  Id.  Dr. Stevenson left the room for a fourth time, leaving the kidney basin now on a countertop.  Id.

The next portion of Mr. Frazier's testimony concerns the creation of the YouCut Video.  Mr. Frazier sat with Mrs. Frazier in the exam room waiting for Dr. Stevenson to return.  Mr.

Frazier testified at his deposition, "I had on my blazer[.]  I just pulled out my phone."[5]  Id.  Mr.

Frazier's deposition testimony continues:

> And so it was—I had a fairly new phone and when I went to engage the camera it
> was like back in selfie mode.  The rear—the camera that was facing me, that's the
> one that came on.  And I was trying to figure out how to get it to flip around to do
> the front facing—to be facing away to me to the stuff on the counter so I can view
> or capture the stuff on the counter.  And—and I just—after just experiencing that
> surreal moment, I saw what I saw, I put my phone back in my pocket.  And I'm
> sitting down trying to take this in.

Id.

Dr. Stevenson returned to the room and told Mr. Frazier, "Yeah, you should feel better

now that all that packing is out of your head."  Id.  Dr. Stevenson then handed Mr. Frazier some

paperwork and rushed the Fraziers out of the room.  Id.

Mr. Frazier states everything shown in the kidney basin on the YouCut Video came out

of his nose that day.  Id.  Even more "gauzelike material" came out of Mr. Frazier's nose, but it

was not placed in the kidney basin and was not shown in the YouCut Video.  Id.  During the

hearing, Mr. Frazier stated, "There was stuff [from his nose] on the counter along the wall."

Mr. Frazier edited the video on his phone with an editing application called YouCut.  Id.

at 37.  Mr. Frazier installed the YouCut application either on February 25, 2020, or "not too long

after . . . ."  Id.  Mr. Frazier used YouCut to shorten and combine two individual videos together:

the self-facing video and the video of the counter.  Id. at 37–38.  Mr. Frazier testified the original

video files do not exist, but he did not destroy them.  Id. at 39.

---

[5]         During the hearing, Mr. Frazier's testimony deviated slightly.  At the hearing, Mr. Frazier said
Mrs. Frazier handed him his phone because he had given it to her after they walked in the exam room.

2.    *Mrs. Frazier.*

Mrs. Frazier testified at a deposition on October 5, 2021, doc. 91-2, and at the September 18, 2023 hearing. Mrs. Frazier's hearing testimony was substantially the same as her deposition testimony.

Mrs. Frazier was in the exam room in Suite 480 with Mr. Frazier on February 25, 2020. Id. at 16. Mrs. Frazier observed Dr. Stevenson and Mr. Frazier discuss time off from work, then Dr. Stevenson began to examine Mr. Frazier's nose. Id. Mrs. Frazier states:

> Dr. Stevenson's demeanor changed. He got quiet. He was looking, looking and he got some other tool that—the headlight. He was just looking and then he said, okay, there is something in your nose and it's what we like to call boogers and so that would definitely stop you from being able to breathe and make you feel stuffy. So, he got some instrument and went in there. Cedrick was grimacing.

Id. at 17.

Dr. Stevenson left the room and returned with another instrument. Id. Dr. Stevenson snipped something in Mr. Frazier's left nostril, then snipped something in Mr. Frazier's right nostril. Id. Dr. Stevenson then used a "long tool" to pull "gunk" out of Mr. Frazier's nose. Id. Mr. Frazier gagged and spat up blood clots. Id. Dr. Stevenson placed a cloth or gauze on Mr. Frazier's shoulder. Id. Dr. Stevenson placed the material from Mr. Frazier's nose on the gauze. Id.

Dr. Stevenson left the room for a second time so "[Mr. Frazier] chose to video it real quick before Dr. Stevenson came back in." Id. The video shows material from Mr. Frazier's nose in the kidney basin. Id. at 18. "There may be some blood clots that he spit in there but the rest of that came out of his [nose]." Id. There was more material, not shown in the video, that was left on the gauze from Mr. Frazier's shoulder. Id. At the hearing, Mrs. Frazier testified her voice can be heard "at the end" of the video.

Dr. Stevenson returned and said, "[Y]ou should feel better now that that packing is out."
Id. Mrs. Frazier later reviewed the video with Mr. Frazier "in amazement." Id.

### 3. *Dr. Stevenson.*

Dr. Stevenson testified at a deposition on October 6, 2021, doc. 181-14, and at the
September 18, 2023 hearing. Dr. Stevenson's hearing testimony was substantially the same as
his deposition testimony, except where noted.

Dr. Stevenson examined Mr. Frazier in one of three exam rooms in Suite 480—exam
room number 1, 2, or 3—on February 25, 2020. Id. at 62. At the hearing, Dr. Stevenson
testified he saw Mr. Frazier between 2:25 and 3:10 p.m. Dr. Stevenson also testified he practices
with other partners in his office, but Dr. Stevenson uses exam rooms 1, 2, and 3 "almost
exclusively" because these exam rooms are dedicated to his use. There are other exam rooms in
Suite 480, and they all have the same ceilings, countertops, wall color, and equipment.

At his deposition, Dr. Stevenson stated he did not remove any packing from Mr. Frazier's
nose on February 25, 2020. Id. at 59. Mr. Frazier's exam was normal. Id. Dr. Stevenson
removed some crusting, but there was no heavy bleeding. Id. Dr. Stevenson did not use four-by-
four gauze during the exam. Id.

Dr. Stevenson is certain the YouCut Video was not recorded in Suite 480. Id. at 59.
During his deposition, Dr. Stevenson listed several differences between the physical
characteristics of the room in the YouCut Video and the physical characteristics of his exam
rooms. Id. The lights, tiles, and air vents in the ceiling in the video are arranged differently from
the light, tiles, and air vents in the ceiling in the Suite 480 exam rooms. Id. The walls in the
video are beige, but the walls in the Suite 480 exam rooms are "robin egg's blue." Id. The
drawer handle shown in the video is different from the drawer handles in Suite 480. Id. The

gloves, hand wipes, and counter cleaner shown on top of the counter in the video are brands SGHS does not carry.  Id.  During the hearing, Dr. Stevenson testified there is not more than one overhead light fixture in any exam room in Suite 480, and every exam room has the same end-to-end configuration of air vents and light fixtures in the ceiling.  Dr. Stevenson testified exam rooms 1, 2, and 3 all have identical paint color, furniture, equipment, counters, cabinetry, hardware, and light-fixture orientation.  Id. at 63.

Dr. Stevenson testified the exam rooms in Suite 480 have not changed in the last 10 years.  Id. at 64.  The hospital has used the same brand of gloves, hand wipes, and counter cleaner and has used the same supplier of these products for as long as Dr. Stevenson can remember.  Id. at 59.

### 4.    *Shawn Crosby.*

Shawn Crosby is the project manager and former "environment of care manager" for Defendant SGHS.  Mr. Crosby provided an affidavit dated January 27, 2022, doc. 184-2 at 169–96, and he testified at the September 18, 2023 hearing.  Mr. Crosby's hearing testimony was consistent with his affidavit.

Mr. Crosby has worked for Defendant SGHS in facilities management since November 2002.  Id. at 170.  He is certified in construction and renovation projects in health care settings. Id.  He is also a licensed plumber and credentialed gas installer.  Id.  Mr. Crosby was involved in the original build-out of the SPGA-ENT offices in Suite 480 in 2012.  He has been involved in maintenance of the suite ever since.  Id.

Mr. Crosby testified none of the significant features of the Suite 480 exam rooms have changed since their build-out.  Id. at 171–72.  The paint color on the walls in Suite 480 has not changed.  Id. at 171.  All of the exam room walls have always been the same blue-green color.

Id.  Mr. Crosby recently removed a light switch plate in one of the exam rooms to look for different paint color underneath, in an effort to confirm no other paint color had been used.  Mr. Crosby did not identify any other colors under the switch plate.  He testified, in his experience, if the rooms had ever been a different color, the color would have appeared underneath the light switch.  Id.  No other significant features of the exam rooms have changed since their build-out, including the drawer pull hardware, the cabinets, or the layout of the vents, air returns, and tiles in the ceiling.  Id. at 172.

Mr. Crosby provided maintenance records to support his testimony.  He provided a document showing "all work orders Facilities Maintenance addressed for Suite 480 . . . from October 1, 2019 through October 29, 2021."  Id. at 171.  These work orders show wall patching and touch-up painting, but the paint color did not change.  Id.  These records do not reflect any change in wall color, change in cabinet or drawer hardware, or change in the ceiling configuration.  Id. at 178–83.

Mr. Crosby testified the YouCut Video was not recorded in Suite 480 because of several differences between the physical characteristics of the facility shown in the YouCut Video and the physical characteristics of Suite 480.  Id. at 174–77.  Specifically, the configuration and orientation of the lights and air vents in the ceiling, the color of the walls, and the drawer pull hardware in the YouCut Video are different from those characteristics in Suite 480.  Id.  During the hearing, Mr. Crosby testified changing the orientation of the ceiling lights and air vents would involve intensive structural changes in the piping above the ceiling.

**B.     Forensics Experts**

*1.     Jim Stafford.*

Plaintiffs retained Jim Stafford as an expert in video forensics and image analysis.  Mr. Stafford created an image of Mr. Frazier's phone on June 28, 2021.[6]  Doc. 184-2 at 9, 69.  Mr. Stafford issued his first expert report on August 11, 2021, doc. 54-1, and a second report on May 3, 2022, doc. 184-2 at 197–216.  Defendants deposed Mr. Stafford on December 14, 2022, and March 8, 2023.  Doc. 160-4 (first deposition transcript); Doc 184-2 at 1–112 (second deposition transcript).  Mr. Stafford also testified at the September 18, 2023 hearing.

Mr. Stafford collected and analyzed relevant data from Mr. Frazier's cellphone.  Relevant to the instant Motion, Mr. Stafford reviewed the YouCut Video file, Screenshot 1, and Screenshot 2.  Mr. Stafford reviewed the metadata associated with these files and others in forming his opinions.  Ultimately, Mr. Stafford opined Mr. Frazier recorded the original video files used to make the YouCut Video on February 25, 2020, the original files were deleted from Mr. Frazier's device and could not be recovered, and Screenshot 1 and Screenshot 2 supported the conclusion the original videos were recorded on February 25, 2020.

Mr. Stafford identified and analyzed the YouCut Video file on Mr. Frazier's device.  Mr. Stafford explained the metadata associated with the YouCut Video showed a creation and modification date of September 29, 2020, as opposed to when the video was purportedly recorded on February 25, 2020.  Mr. Stafford determined the disparity was caused by Mr. Frazier's habit of saving media files from his cellphone to other devices to free up storage space.

---

[6]     As an aside, it is unclear why Mr. Stafford would create an image of Mr. Frazier's device on June 28, 2021.  Plaintiffs did not produce the YouCut Video to Defendants until July 15, 2021, and the video had not been mentioned in any filing in the case.  Defendants were not aware of the YouCut Video on June 28, 2021, and had not raised any challenge to the authenticity of the video.

Doc. 184-2 at 198.  Mr. Stafford found information on Mr. Frazier's cellphone indicating Mr. Frazier performed such a save on September 29, 2020.  In fact, Mr. Stafford identified numerous files bearing September 29, 2020 as a creation and modification date, which Mr. Stafford attributed to Mr. Frazier's action on that date.

In searching for the original video files, Mr. Stafford located a file name and metadata associated with a deleted video file.  Id. at 200.  The actual file was not recovered.  The metadata for the deleted video file shows the file was created at 3:43 p.m. on February 25, 2020.  Id.  At the hearing, Mr. Stafford also explained he located records showing eight instances of YouCut being used on Mr. Frazier's phone between 3:20 and 3:43 p.m. on February 25, 2020.  Mr. Stafford relied on these records in support of his opinions.

Mr. Stafford also found two images that appear to be screenshots showing the metadata of the original video files (Screenshot 1 and Screenshot 2) used to create the YouCut Video. Each of the screenshots shows a small "thumbnail" image in the top half and textual metadata in the bottom half.  The metadata include a file name, a file path, file size, length of the video, and a "modified" date.  Id. at 202, 204.  The Screenshot 1 metadata display "Modified February 25, 14:42."  In Screenshot 1, the thumbnail is similar to the first portion of the YouCut Video (i.e., the front-facing camera image of Mr. Frazier).[7]  The thumbnail in Screenshot 2 matches an image from the second part of the YouCut Video, showing the kidney basin full of bloody-

---

[7]    There is one noticeable difference between the thumbnail image in Screenshot 1 and the YouCut Video.  The thumbnail in Screenshot 1 depicts Mr. Frazier reaching for his nose, but Mr. Frazier does not reach for his nose in the YouCut Video.  This disparity confirms the original video or videos used to create the YouCut Video included footage of other activity that was not incorporated into the YouCut Video.  The metadata for Screenshot 1 also shows the original video was 13 seconds long, but the first portion of the YouCut video is only 5 second long.  This means at least 8 seconds—the majority of the original video—is likely missing from the YouCut Video.

looking material on the countertop.  Id. at 204.  The Screenshot 2 metadata display "Modified February 25, 14:43."  Id.

Ultimately, Mr. Stafford concluded the original video files used to make the YouCut Video were recorded on February 25, 2020.  Id. at 205–06.  Mr. Stafford based that conclusion in large part on the metadata shown in Screenshot 1 and Screenshot 2.  Mr. Stafford concluded the metadata in the screenshots are accurate and cannot be altered by a user.  Therefore, Mr. Stafford concluded the YouCut Video is authentic and was recorded on February 25, 2020.

During Mr. Stafford's deposition, Defendants' counsel asked Mr. Stafford about whether a user could have reset the time and date of Mr. Frazier's cellphone before recording the original video files in order to manipulate the metadata associated with the original files.  Doc. 160-44 at 11.  This question was based on Defendants' forensic expert's report, which is discussed below in more detail.  Mr. Stafford acknowledged the possibility of manipulation through a date and time reset, but Mr. Stafford testified he did not find any evidence of such a reset in Mr. Frazier's phone.  Id. at 11–12.  At the hearing, Mr. Stafford testified if someone had performed a manual date and time reset, there would be a record of the change on the phone.  However, Mr. Stafford stated he only performed a "cursory examination" of 107,000 files in Mr. Frazier's phone.  Mr. Stafford did not go through "each and every file."  Additionally, Mr. Stafford did not conduct any tests on Mr. Frazier's phone or any similar device to confirm a manual date and time reset would generate a record that could be identified in a forensic analysis.  Even so, Mr. Stafford maintained he found no evidence of a date and time reset, and he would have expected to if such a reset had occurred.

During the hearing, Mr. Stafford also testified for the first time about the differences in wall color between the YouCut Video and Suite 480.  Mr. Stafford said the colors shown in the

YouCut Video are unreliable.  As an example, Mr. Stafford pointed out "greens and things" in the color of Mr. Frazier's face in the YouCut Video that are not actually present.  Outside of the differences in wall color, Mr. Stafford had no explanation for visual differences between the exam room in the YouCut Video and the exam rooms in Suite 480.

### 2.   *Vincente Rosado.*

Defendants retained Vincente Rosado as a mobile device forensics expert.  Mr. Rosado analyzed Mr. Frazier's cellphone and provided a report.  Doc. 184-1.  Mr. Rosado discovered eight copies of the YouCut Video in Mr. Frazier's phone.  Id. at 10–11.  However, Mr. Rosado concluded the date and time Mr. Frazier recorded the original videos are "forensically unverifiable" because Mr. Frazier edited the videos with the YouCut application.  Id. at 10.

Mr. Rosado also analyzed Screenshot 1 and Screenshot 2.  Mr. Rosado concluded the screenshots were "manipulated to the extent that no determination can or should be made as to [their] authenticity."  Id. at 22, 24.  Mr. Rosado discussed both the metadata of the screenshots themselves and the video metadata the screenshots purportedly show.[8]  Mr. Rosado explained the file names of screenshots indicate they were created on September 24, 2020 (e.g., Screenshot_20200924-124420.png), and the metadata associated with the screenshots show the screenshots were modified on September 29, 2020.  Id. at 22.  For the original video files described in the screenshots, the names of the files indicate they were created on February 25, 2020, and the metadata include a "Modified" date for the video file of "February 25."  Mr.

---

[8]     This point warrants additional explanation.  Screenshots can be analogized to digital photos of a device's screen as it appeared on a particular occasion.  These two screenshots analyzed by the forensic experts appear to capture Mr. Frazier's device's screen while the device displayed information about the original video files.  In other words, it appears a user was looking at the file information for the original video files (i.e., metadata showing the name, date, and thumbnail for the original video files) on a particular occasion, and then that user created the screenshots.  Because a screenshot is analogous to a digital photo, each screenshot has its own metadata showing when the screenshot was made, the size of the screenshot file, etc.

Rosado notes the metadata "Modified" file includes a month and date the files were modified but does not show the year the files were modified.  Id.

Mr. Rosado provided a lengthy explanation of how a user could manually reset the date and time on Mr. Frazier's cellphone to create a metadata screenshot with an inaccurate earlier date.  Id. at 19–20.  Specifically, Mr. Rosado explained on any given date, a user could reset the device's date and time to an earlier date and time, like the afternoon of February 25, 2020, then record videos and capture screenshots of the metadata associated with the original video files. Then the user could reset the device back to the actual, current date and time.  That process would show inaccurate, earlier metadata for the original video files compared to when the videos were actually recorded.  Mr. Rosado confirmed this theory by performing a test on a cellphone identical to Mr. Frazier's cellphone, though, to be sure, Mr. Rosado did not identify records on Mr. Frazier's cellphone showing this manual reset actually occurred.

As a result of his analysis, Mr. Rosado concluded the YouCut Video "cannot said to be 'authentic,' i.e., actually recorded when and where Plaintiffs testified it was, within a reasonable degree of certainty . . . ."  Id. at 26.

C.    Plaintiffs' Medical Expert Dr. Mikula

Plaintiffs' medical expert, Dr. Suzette Mikula, provided information relevant to this dispute.  Dr. Mikula signed an expert report on August 3, 2022.  Doc. 184-3 at 51–55.  Dr. Mikula relied on the YouCut Video in her report.  Id. at 51.  Defendants deposed Dr. Mikula on December 21, 2022.  Id. at 1–40.  Dr. Mikula opined Dr. Stevenson failed to meet the standard of

care.  Dr. Mikula also concluded the YouCut Video shows a cottonoid pledget removed from Mr. Frazier's nose.[9]  Id. at 52, 54.

During her deposition, Dr. Mikula expressed doubt that everything in the kidney basin in the YouCut Video was removed from Mr. Frazier's nose.  Id. at 15–16.  Dr. Mikula thought the material shown in the left side of the kidney basin was gauze used to staunch or wipe up blood, not something left in Mr. Frazier's nose.  Id. at 15.  Dr. Mikula said she "would definitely question" any claim that all the material in the kidney basin came from Mr. Frazier's nose "because, I don't know—I mean, that looks like a pretty big piece of gauze."  Id. at 16.

### D.    Video and Documentary Evidence

#### 1.    October 5, 2021 walk-through inspection of Suite 480.

On October 5, 2021, Plaintiffs conducted a walk-through inspection of Suite 480. Plaintiffs and Defendants each had videographers present at the inspection.  Defendants submitted the affidavit of Dale Leornard, Defendants' professional videographer, along with the video Mr. Leonard prepared.  Doc. 184-2 at 113–23.  Mr. Leonard affirms the video fairly and accurately depicts the inspection and it has not been materially edited or modified.  Id. at 114. Plaintiffs did not submit their own video.

Mr. Leonard's inspection video shows several people were present during the inspection, including Mr. and Mrs. Frazier, their attorney, Plaintiffs' videographer, Mr. Leonard, Defendants' attorney, and at least two SGHS employees.  The video shows the hallway outside Suite 480, the waiting area inside the suite, the hallway leading to exam rooms 1, 2, and 3, and

---

[9]    Cottonoid pledgets, also known as surgical patties, are small, absorbent pads Dr. Stevenson uses to constrict tissue and minimize bleeding before a surgical procedure.  See Doc. 251-2.

the exam rooms.  There is a nurses' station in Suite 480 just past the waiting area.  The exam

rooms are down a hallway from the nurses' station.

The walls of the hallway outside Suite 480 are beige or off-white.  All of the walls inside

Suite 480, including in the exam rooms, are painted blue-green.

The inspection video shows exam rooms 1, 2, and 3 in Suite 480.  All three rooms are

nearly identical.  There is a woodgrain cabinet with a beige countertop in each exam room.  The

cabinet and drawer handle hardware are silver and rectangular with slightly rounded corners.  On

top of each countertop sits a green box of Kleenex tissues, a pink box of disposable gloves, and a

purple container.  There is one rectangular fluorescent light fixture in the ceiling.  There are two

square air vents abutting the light fixture, one on each end.

During the video, Mr. Frazier indicates the exam rooms and the nurses' station look

different than he remembers.  Defendants' counsel and an SGHS employee assert the building

has not changed.

### 2.   *Medical records.*

Plaintiffs submitted records of Mr. Frazier's visit with Dr. Stevenson at Suite 480 on

February 25, 2020.  Doc. 250-1.  These records show a service time of 2:25 p.m. for "ambulatory

care."  Id. at 2.  The records state Mr. Frazier's "nose is healing as expected.  There is no sign of

infection or complication."  Id. at 9.  The records show a service time of 3:10 p.m. for "patient

education."  Id. at 11.

### 3.   *Maintenance records.*

Plaintiffs submitted 47 work orders for Suite 480.  Doc. 240-3.  These maintenance

records are consistent with the list of work orders attached to Mr. Crosby's affidavit.  Forty work

orders were completed between February 25, 2020 and October 5, 2021.  Two work orders show

the "task" as "Wall Repair–Walls–Patch/Paint/Repair Wall Covering."  Id. at 24–25.  This work

began on April 21, 2021, and ended on April 23, 2021.  The work orders show this work took a

total of 13.5 hours.  Id.  Thirteen other work orders include ceiling tile replacement.  Id. at 14–

15, 28–30, 32, 36, 39–44.  Most of these work orders concern the replacement of a wet ceiling

tile in the "back hallway" due to an air conditioning malfunction.  There are also two work

orders for replacing light bulbs.  One is for ceiling lights in exam room number 5.  Id. at 31.  The

other is for six three-way light bulbs for lamps.  Id. at 45.

## FACTUAL FINDINGS

### I.    Analysis of Record Evidence

Before proposing any findings of fact, it is necessary to analyze certain aspects of the

record and to identify disputed facts.

### A.    The Exam Rooms in Suite 480 Are Materially Different From the Room in the YouCut Video

Defendants argue there are several differences between the physical features of the exam

rooms in Suite 480, as shown in the inspection video, and the physical features of the room in the

YouCut Video.  Specifically, Defendants point to: the configuration of ceiling tiles, lights, and

air vents; the color of the walls; the appearance of the drawer pull hardware; the color of the base

cabinets; and the medical supply containers on the counters.  Plaintiffs do not dispute or

challenge the obvious differences in the physical features.  Nonetheless, the differences are

central to the Court's analysis and, therefore, are described here.

#### 1.    Configuration of ceiling tiles, lights, and air vents.

The arrangement of ceiling tiles, lights, and air vents in the Suite 480 exam rooms is

plainly different from the arrangement of ceiling tiles, lights, and air vents shown in the ceiling

above Mr. Frazier in the YouCut Video.  Each of the Suite 480 exam rooms has one rectangular

fluorescent light troffer in the ceiling.  The light troffer is adjacent to square-shaped vents on

each end—one supply vent and one return vent.  In the YouCut Video, two rectangular light

troffers appear above Mr. Frazier's head.  There are no vents on the ends of the lights.  The two

lights are parallel with one square-shaped vent between them.  The ceilings in the rooms are

obviously different.

### 2.     *Wall color.*

The wall color in the YouCut Video and the wall color in Suite 480 are different.  The

Suite 480 exam rooms are a bright, blue-green color.  The wall shown behind Mr. Frazier in the

YouCut Video is off-white or beige.

At the hearing, Mr. Stafford testified the colors shown in the YouCut Video are

unreliable.  He stated the colors shown in Mr. Frazier's face are distorted in the YouCut Video.  I

have reviewed the videos and considered Mr. Stafford's testimony.  Mr. Stafford is correct the

colors in YouCut Video appear slightly distorted, but the distortion is minimal.  For the most

part, the colors depicted in the video appear natural.  The minor color distortions in the YouCut

Video would not plausibly make a bright, blue-green wall appear off-white or beige.  The wall

colors in the rooms are obviously different.

### 3.     *Drawer pulls.*

The drawer pull on the cabinet in the YouCut Video is different from the drawer pulls in

the Suite 480 exam rooms.  Each Suite 480 exam room has a brown, wood grain cabinet with a

contrasting beige countertop.  Each cabinet has one drawer and two doors.  Each drawer and

door has a metallic, rectangular pull handle with rounded corners.  Each pull has a rectangular

shape, with nearly right angles.

A portion of a drawer pull is visible in the second portion of the YouCut Video.  The drawer pull is an oval-shaped handle that extends from the face of the drawer at a gentle, sloping angle.  The drawer pulls in the Suite 480 exam rooms and the drawer pull in the YouCut Video are obviously different.

### 4.    *Cabinet color.*

The cabinet colors in the two videos are different.  The base cabinets in the Suite 480 exam rooms are a brown wood grain with a beige countertop.  The colors of the cabinet and countertop noticeably contrast.  In the YouCut Video, both the color of the countertop and the color of the cabinet are a similar beige or yellow.  The countertop and cabinet colors do not contrast.

I considered Mr. Stafford's testimony about the reliability of the colors in the YouCut Video.  As noted, any color distortion in the YouCut Video is minimal.  The color distortion could not plausibly account for the visual disparity between cabinet colors in the two rooms.  The cabinet colors are plainly different, even considering any minor color distortion in the YouCut Video.

### 5.    *Medical supply containers.*

The YouCut Video and the walk-through video of the Suite 480 exam rooms depict various items on the countertops.  In the Suite 480 exam rooms, there are three medical supply containers on each countertop in each exam room: a pink box of disposable gloves; a cylindrical white container of cleaning wipes with a purple label; and a green and white tissue box.  In the YouCut Video exam room, there are also three items visible on the countertop: a blue box of

disposable gloves; a cylindrical white container with a red label; and a smaller cylindrical container.  The items on the countertops are obviously different.[10]

In sum, the room shown in the YouCut Video and the Suite 480 exam rooms are different in several significant ways.  The ceilings, wall colors, drawer pulls, cabinet colors, and medical supplies are all obviously different.

**B.    Dr. Stevenson Examined Mr. Frazier on February 25, 2020, in Exam Room 1, 2, or 3 in Suite 480**

Dr. Stevenson testified at his deposition he only sees patients in exam rooms 1, 2, and 3. He repeated this testimony at the evidentiary hearing on September 18, 2023.  Dr. Stevenson acknowledged medical records for Mr. Frazier's February 25, 2020 exam do not identify in which of the three exam rooms the exam occurred.  Dr. Stevenson was unable to recall in which of the three exam rooms he conducted Mr. Frazier's February 25, 2020 exam, but he testified he was sure the exam occurred in exam room 1, 2, or 3 because he only uses those three exam rooms.

Mr. and Mrs. Frazier both testified the February 25, 2020 exam occurred in Suite 480, but neither could recall the specific exam room.  Specifically, at his deposition, Mr. Frazier testified he recorded the YouCut Video on February 25, 2020, in one of the exam rooms in Suite 480, but he could not remember exactly which exam room.  Doc. 65-1 at 9, 35–38.  Mr. Frazier's testimony at the evidentiary hearing on this issue was almost identical.  Mr. Frazier confirmed he did not record the YouCut Video anywhere else in the building or anywhere else in town.  Mr. Frazier further testified he and Mrs. Frazier entered the lobby area of the Suite 480 on February

---

[10]    These items are disposable and can easily be replaced, so the difference between them—without more—is of limited value.  However, Dr. Stevenson testified the hospital has not and does not carry the brands of supplies shown in the YouCut Video.  This point is addressed below in more detail.

25, 2020, and checked in at the front counter.  He explained Amy Williamson—a SPGA-ENT employee—was at the check-in window.  Mr. Frazier explained another person, possibly Ms. Bautista, took Mr. and Mrs. Frazier "to the back," behind the lobby to an exam room.

Mrs. Frazier testified at her deposition that Mr. Frazier recorded the YouCut Video in Dr. Stevenson's exam room on February 25, 2020.  Doc. 91-2 at 18.  At the evidentiary hearing, Mrs. Frazier testified Mr. Frazier recorded the YouCut Video inside the same suite where the inspection video was recorded, though she could not remember which room.  Mrs. Frazier further testified the February 25, 2020 office visit was her third visit to Suite 480.  Mrs. Frazier had previously accompanied Mr. Frazier to an exam room in Suite 480 to see Dr. Stevenson on December 27, 2019, and January 28, 2020.  Mrs. Frazier explained on February 25, 2020, she and Mr. Frazier went to the fourth floor and entered the lobby.  Mrs. Frazier testified Mr. Frazier checked in at the front check-in counter.  At the hearing, Mrs. Frazier could not remember who led her and Mr. Frazier to the back, but she said it was one of "two or three women" who work there, and Mrs. Frazier would know her if she saw her.  The woman took Mr. and Mrs. Frazier to an exam room; however, Mrs. Frazier could not confirm which exam room.

Considering all of the evidence together, I conclude Dr. Stevenson examined Mr. Frazier on February 25, 2020, in exam room 1, 2, or 3 in Suite 480.  All of the testimony supports the conclusion the exam occurred in an exam room in Suite 480.  Mr. and Mrs. Frazier expressly rejected any notion the February 25, 2020 exam occurred outside of Suite 480.  Mr. and Mrs. Frazier visited Suite 480 on multiple occasions and were given an opportunity to inspect the suite during discovery.  Additionally, Dr. Stevenson testified credibly he only uses exam rooms 1, 2, and 3 and has only used those rooms for many years.  Dr. Stevenson, therefore, logically concluded the February 25, 2020 exam occurred in one of these three rooms.  There is no

contrary evidence suggesting Dr. Stevenson ever used any other exam room in Suite 480.

Therefore, I conclude Dr. Stevenson examined Mr. Frazier on February 25, 2020, in Exam Room

1, 2, or 3 of Suite 480, though it is unclear in which one of these three exam rooms the exam

occurred.[11]

Plaintiffs, through counsel and during testimony, have speculated the February 25, 2020

exam might have occurred in some other exam room in Suite 480 (i.e., an exam room other than

exam rooms 1, 2, or 3 but still in Suite 480).  There is no evidentiary support for this theory.

Plaintiffs merely question the strength of the evidence in the record or vaguely suggest there is

some possibility the exam might have occurred elsewhere.  For example, Plaintiffs emphasize

Mr. Frazier's medical record does not specify the exam room where Dr. Stevenson examined Mr.

Frazier on February 25, 2020.  Doc. 194 at 3.  While Plaintiffs point to portions of the

evidentiary record that are silent on the location of the February 25, 2020 exam, Plaintiffs fail to

address the significant evidence the February 25, 2020 exam occurred in Suite 480 in exam

rooms 1, 2, or 3.  Plaintiffs have not offered any evidence to rebut Dr. Stevenson's testimony that

he only ever uses exam rooms 1, 2, and 3 and did so on February 25, 2020.  Plaintiffs have had a

full and fair opportunity to develop the record on this point, and they have failed to come

forward with any evidence suggesting the February 25, 2020 exam occurred any place other than

in Suite 480 in exam room 1, 2, or 3.

---

[11]     In a brief on the instant Motion, Plaintiffs complained that during the SPGA-ENT site inspection, they were denied access to the operating room where Dr. Stevenson performed the January 21, 2020 surgery and were only allowed to inspect a similar operating room.  Doc. 194 at 3.  This issue is irrelevant.  The January 21, 2020 surgery took place in a different building than the February 25, 2020 exam.  There is no indication the YouCut Video was recorded in an operating room, and Plaintiffs have never claimed it was.

Even if the February 25, 2020 exam occurred in a different exam room in Suite 480 —

and there is no evidentiary support for that conclusion—it would not change the analysis.  Dr.

Stevenson testified there are other exam rooms in Suite 480 other than exam rooms 1, 2, and 3,

but those other exam rooms are materially identical to exam rooms 1, 2, and 3.  Dr. Stevenson

explained the other exam rooms have the same ceilings, lights, vents, wall colors, and equipment

as exam rooms 1, 2, and 3.  Mr. Crosby testified all of the walls in Suite 480 have the same blue-

green colored paint and all of the Suite 480 exam rooms have the same ceiling configuration with

one light, one air supply vent, and one air return vent.  Therefore, even if the YouCut Video was

recorded in a different Suite 480 exam room, the YouCut Video should still depict an exam room

that is materially similar in appearance to exam rooms 1, 2, and 3.[12]

**C.      The Appearance of Exam Rooms 1, 2, and 3 in Suite 480 Has Not Materially
         Changed Since February 25, 2020**

The record demonstrates exam rooms 1, 2, and 3 in Suite 480 did not materially change

between February 25, 2020 and October 5, 2021, when Plaintiffs inspected the exam rooms.  Dr.

Stevenson testified the exam rooms in Suite 480 have not changed since February 25, 2020.

Shawn Crosby testified the exam rooms have not changed since they were built out in 2012.  Mr.

Crosby provided maintenance records showing no significant change was made to the Suite 480

exam rooms between February 25, 2020 and the date of the walk-through inspection.  Mr.

Crosby testified convincingly that extensive work would be required to change the configuration

---

[12]      Plaintiffs recently filed a motion to amend their proposed pretrial order, asserting during the site
inspection Defendants' counsel "took the Fraziers in the direction that he wanted to go and showed them
the rooms that he wanted to show them."  Doc. 258 at 12.  This fact is of little or no significance.
Plaintiffs conducted the inspection on October 5, 2021, nearly two years before the evidentiary hearing on
the instant Motion.  There is no indication in the site inspection video Plaintiffs were prevented from
inspecting other areas of Suite 480.  Plaintiffs have not, at any time, asked to inspect other areas of Suite
480 or argued such additional inspection would provide material information.

of ceiling lights, vents, and tiles in the Suite 480 exam rooms to make those aspects of the rooms appear consistent with the room seen in the YouCut Video, and no such work has been performed.

Plaintiffs vaguely suggest Defendants materially changed the appearance of the exam rooms between February 25, 2020 and October 5, 2021, but Plaintiffs fail to provide any compelling evidence supporting that notion. Mr. and Mrs. Frazier testified at the evidentiary hearing someone must have removed a counter from one of the exam rooms before the October 5, 2021 walk-through inspection. Mr. Frazier testified he could tell something had been removed because he observed a "brown, grayish stripe" along the baseboards in one of the exam rooms. Plaintiffs offered no support for Mr. Frazier's speculation.[13]

Mr. Frazier also suggested the maintenance records for Suite 480 are unreliable because, in his opinion, 13.5 hours is "too long" for a maintenance person to touch up paint and replace ceiling tiles. Mr. Frazier noted the maintenance records did not specify the color of touch-up paint, suggesting, perhaps, some maintenance person painted all of the Suite 480 exam rooms a different color in 13.5 hours but only recorded work for touch-up paint and replacing tiles. Mr. Frazier also speculated it would be easy to rearrange the ceiling tiles, vents, and counters in the exam rooms, but he offered no basis for this speculation.

Plaintiffs offer only unsupported speculation about the sufficiency of the evidence Defendants presented to the Court. Plaintiffs do not offer any evidence of their own that would demonstrate the Suite 480 exam rooms were changed in any material way during the relevant time period. Plaintiffs' vague attempts to poke holes in the record evidence are not compelling.

---

[13]     There is no "brown, grayish stripe" visible in the site inspection video. Mr. Frazier merely testified he remembered seeing a stripe. The Court notes Plaintiffs had a videographer present at the site inspection, but they did not submit their own video to the Court for consideration.

Ultimately, I conclude the evidence demonstrates the Suite 480 exam rooms were not changed in any material way during the relevant period.

### D. Evidence From Forensic Experts Shows the YouCut Video Metadata and Screenshot 1 and Screenshot 2 Could Be Unreliable; Otherwise, Evidence From These Experts Is Inconclusive

Before analyzing the forensic expert opinions, it is helpful to put their work in context. All parties and the experts agree to the following facts. First, the YouCut Video was found on Mr. Frazier's cellphone, but the original video files used to create the YouCut Video could not be located. Second, Screenshot 1 and Screenshot 2 (which appear to depict metadata about the original videos) were found on Mr. Frazier's cellphone.[14]

The two screenshots are important. Plaintiffs assert the two screenshots show Mr. Frazier recorded the original video files on February 25, 2020. Plaintiffs argue the screenshots support their claim the YouCut Video was recorded during the February 25, 2020 exam. Defendants argue the screenshots could have been easily manipulated and, therefore, provide little support for Plaintiffs' position. Defendants go further and argue if the YouCut Video was not recorded in Suite 480 on February 25, 2020, then the two screenshots are additional fabricated evidence meant to buttress the fabricated YouCut Video.

Defendants' forensic expert, Mr. Rosado, explained how a user could have created the two screenshots to include false metadata about the original video files. He explained if a user manually reset the date on Mr. Frazier's device to February 25, 2020, before recording the original video files, the metadata for those files would show February 25, 2020, even though the

---

[14] As noted, the screenshots are essentially digital photos of Mr. Frazier's device display on a particular occasion. These screenshots appear to show the device display while the user viewed file information about the original video files. Neither expert could find the original video files on Mr. Frazier's device.

videos were actually recorded on a different date.  Any screenshot of the file information for the original video files would then show the artificially set date.  Mr. Rosado performed a test on a cellphone identical to Mr. Frazier's to show how this fabrication could be accomplished.  Mr. Rosado did not identify actual forensic evidence of metadata manipulation.  Ultimately, Mr. Rosado maintains it is impossible to determine when the videos were recorded.[15]

Mr. Stafford agrees the relevant metadata associated with the original video files, as shown in the screenshots, could have been manipulated with a manual date and time reset.  But Mr. Stafford identified no evidence the date and time were reset.  In his own words, Mr. Stafford only performed a "cursory examination" for evidence of a manual date and time reset.  Mr. Stafford did not perform any testing to confirm he would in fact be able to identify evidence of manipulation.  Ultimately, Mr. Stafford concludes Mr. Frazier recorded the original video or videos on the afternoon of February 25, 2020, and created the YouCut Video that same day.  Mr. Stafford testified he could not confirm where the original videos were recorded.

Considering the forensic expert testimony, I conclude it is feasible Plaintiffs manipulated the metadata associated with the screenshots.  However, I do not find either forensic expert offered any significant information about the likelihood manipulation actually occurred.  Both experts agreed manipulation was possible through a manual date and time reset, but neither found evidence of a reset that would have resulted in inaccurate metadata in the screenshots.  In terms of the location where the YouCut Video and the underlying videos were recorded, the forensic experts offer no additional helpful information.

---

[15]     Mr. Rosado also opined the YouCut Video could not have been recorded in Suite 480, but I place little to no weight on this opinion.  Mr. Rosado's opinion about the location of where the YouCut Video is based largely, if not exclusively, on witness testimony about the appearance of the Suite 480 exam rooms. There is no indication Mr. Rosado has any unique expert qualification that would allow him to offer insight into the disparities in the physical appearance of the exam rooms.

II.      **Proposed Findings of Fact**

Based on the record before me and the foregoing analysis, I propose the following

findings of fact:

1.      On February 25, 2020, Mr. Frazier, accompanied by Mrs. Frazier, appeared for a scheduled post-operative appointment with Dr. Stevenson at the SPGA-ENT offices at 3025 Shrine Road, Suite 480, Brunswick, Georgia.

2.      Dr. Stevenson examined Mr. Frazier in exam room 1, 2, or 3 in Suite 480.

3.      Plaintiffs produced the YouCut Video to Defendants during discovery on July 15, 2021.

4.      The YouCut Video is an electronic file created using the YouCut video editing application.

5.      The original video file or files used to create the YouCut Video were not produced by Plaintiffs in discovery.  The original video file or files were deleted from Mr. Frazier's electronic device and are unrecoverable.

6.      The YouCut Video shows Mr. Frazier in a room with at least two rectangular overhead light fixtures in the ceiling with a square vent between them, drawers with oval-shaped handles, and off-white walls.

7.      On October 5, 2021, Suite 480 exam rooms 1, 2, and 3 each had one, single rectangular overhead light fixture in the ceiling with adjacent square air vents, drawers with square-shaped handles, and blue-green walls.

8.      Suite 480 exam rooms 1, 2, and 3 did not materially change in appearance between February 25, 2020, and October 5, 2021.

9.      Mr. Frazier did not record the YouCut Video or the videos used to make the YouCut Video in Suite 480 on February 25, 2020.

## LEGAL STANDARD

Courts have the inherent power to fashion appropriate sanctions for abuses of the judicial

process, including the severe sanction of outright dismissal of a lawsuit.  Chambers v. NASCO,

Inc., 501 U.S. 32, 44–45 (1991).  This authority is "governed not by rule or statute but by the

control necessarily vested in courts to manage their own affairs so as to achieve the orderly and

expeditious disposition of cases." Link v. Wabash R.R. Co., 370 U.S. 626, 630–31 (1962).

Courts consistently use their inherent power to sanction parties who fabricate evidence.

See, e.g., Gibson v. Wash Box, LLC, No. 1:17-CV-1965, 2019 WL 13330951, at *2 (N.D. Ga.

Jan. 14, 2019) ("Sanctions based on a court's inherent power are 'most often invoked where a

party commits perjury or destroys or doctors evidence.'" (quoting Qantum Commc'ns Corp. v.

Star Broad., Inc., 473 F. Supp. 2d 1249, 1269 (S.D. Fla. 2007))); Vargas v. Peltz, 901 F. Supp.

1572, 1581 (S.D. Fla. 1995) (collecting cases).

Typically, a court can only exercise its inherent power if it finds a party acted in bad

faith. Martin v. Automobili Lamborghini Exclusive, Inc., 307 F.3d 1332, 1335 (11th Cir. 2002).

"Bad faith is defined as 'dishonesty of belief, purpose, or motive.'" Yates v. Cobb Cnty. Sch.

Dist., No. 1:15-CV-3211, 2016 WL 11499651, at *2 (N.D. Ga. Feb. 3, 2016) (citing Black's Law

Dictionary (10th Ed. 2014)).   "[T]he concept of bad faith clearly embraces fabricating or

destroying evidence and then lying about doing so." Oniha v. Delta Airlines, Inc., No. 1:19-CV-

05272, 2021 WL 4930127, at *4 (N.D. Ga. Sept. 13, 2021) (collecting cases), aff'd sub nom.

Oniha v. Delta Air Lines, Inc., No. 21-13532, 2022 WL 580933 (11th Cir. Feb. 25, 2022).

Once a court determines misconduct has occurred, it must determine the appropriate

sanction.   Dismissal with prejudice is an extreme sanction.   Before dismissing a case with

prejudice as a sanction, a court must make two findings: "There must be both a clear record of

willful conduct and a finding that lesser sanctions are inadequate." Zocaras v. Castro, 465 F.3d

479, 483 (11th Cir. 2006); Betty K Agencies, Ltd. v. M/V MONADA, 432 F.3d 1333, 1339

(11th Cir. 2005).   "[W]illfulness generally connotes intentional action taken with at least callous

indifference for the consequences." Jove Eng'g, Inc. v. I.R.S., 92 F.3d 1539, 1555 (11th Cir.

34

1996) (citing <u>Sizzler Fam. Steak Houses v. W. Sizzlin Steak House, Inc.</u>, 793 F.2d 1529, 1535 (11th Cir. 1986)).

Dismissal with prejudice is an appropriate sanction for parties who fabricate critical evidence and who falsely testify about the fabrication of such evidence.  <u>See, e.g.</u>, <u>Oniha</u>, 2022 WL 580933, at *2 (affirming dismissal for "fabrication of critical evidence and false statements when questioned about that fabrication"); <u>Qantum Commc'ns Corp. v. Star Broad., Inc.</u>, 473 F. Supp. 2d 1249, 1269 (S.D. Fla. 2007) ("[T]he need for sanctions is heightened when the misconduct relates to the pivotal or 'linchpin' issue in the case." (citing <u>Vargas v. Peltz</u>, 901 F. Supp. 1572, 1582 (S.D. Fla. 1995); and then citing <u>Nichols v. Klein Tools, Inc.</u>, 949 F.2d 1047, 1049 (8th Cir. 1991))); <u>Neal v. IMC Holdings, Inc.</u>, No. 1:06-CV-3138, 2009 WL 10669622 (N.D. Ga. Mar. 31, 2009) (dismissing case because plaintiff produced an altered email from defendant in a sex discrimination and retaliation case, adding "as a mother" to a genuine email, so fabricated email evidence read: "Perhaps the commute to Chicago is not fitting into your lifestyle *as a mother*?") (emphasis added); <u>cf.</u> <u>Ctr. for Individual Rts. v. Chevaldina</u>, No. 16-CV-20905, 2021 WL 8774249 (S.D. Fla. Aug. 10, 2021) (denying motions for sanctions for fabricating evidence because fabricated evidence was relevant only to a dismissed counterclaim and had no bearing on the proceedings before the court).  The Eleventh Circuit has explained dismissal with prejudice is more appropriate than dismissal without prejudice where the party (not counsel) fabricates evidence.  <u>See</u> <u>Betty K Agencies</u>, 432 F.3d at 1338 (citing <u>Gratton v. Great Am. Commc'ns</u>, 178 F.3d 1373, 1375 (11th Cir. 1999)).

The evidentiary standard required for imposing a sanction of dismissal is somewhat unsettled, but courts in this Circuit typically require clear and convincing evidence of misconduct.  <u>Roche Diagnostics Corp. v. Priority Healthcare Corp.</u>, No. 2:18-CV-01479, 2020

WL 2308319, at *4 (N.D. Ala. May 8, 2020) (collecting cases) ("The Eleventh Circuit has not specified the appropriate evidentiary standard for a court to apply when exercising its inherent power to order case-ending sanctions pursuant to a party's misconduct."); <u>see also</u> <u>In re Brican Am. LLC Equip. Lease Litig.</u>, 977 F. Supp. 2d 1287, 1293 n.6 (S.D. Fla. 2013) ("The Court therefore applies . . . the more exacting clear and convincing evidence standard to the request for dispositive sanctions."), <u>report and recommendation adopted</u>, 2013 WL 12092311 (S.D. Fla. Nov. 15, 2013); <u>JTR Enterprises, LLC v. Columbian Emeralds</u>, 697 F. App'x 976 (11th Cir. 2017) (finding no error where district court applied clear and convincing evidence standard to deny motion for sanctions).

As movants, Defendants bear the burden to prove Plaintiffs submitted false evidence. <u>See</u> <u>Geiger v. Carnival Corp.</u>, 16-24753-CV, 2017 WL 9362844, at *7 (S.D. Fla. Oct. 4, 2017) (citing <u>Zocaras v. Castro</u>, 465 F.3d 479, 483 (11th Cir. 2006)) (recommending the court deny a motion to dismiss for fraud because moving party failed to meet its burden), <u>report and recommendation adopted</u>, 2017 WL 9362843 (S.D. Fla. Oct. 31, 2017).

**DISCUSSION**

## I. Defendants' Motion Is Properly Before the Court

Plaintiffs raise a threshold challenge and contend Defendants brought this Motion prematurely, without adequate conferral, and in bad faith. Doc. 194 at 7. Plaintiffs contend they should be awarded fees and costs for having to defend the Motion. Plaintiffs' challenge is baseless.

There was ample conferral before Defendants filed the Motion, Defendants timely filed it, and the Motion is meritorious. Defendants first notified Plaintiffs about their concerns when Plaintiffs produced the YouCut Video over two years ago. Doc. 52. Defendants' counsel

notified Plaintiffs' counsel over one year ago Defendants would seek relief for the YouCut Video on the theory the video was fabricated. Doc. 208-1 at 11. Defendants filed their Motion before the civil motions deadline expired. See Doc. 141.

Additionally, the parties have had sufficient opportunity to develop the record. Plaintiffs employed a video forensics and image analysis expert witness over two years ago, before they even produced the YouCut Video. The parties have had an opportunity to make discovery requests, subpoena witnesses, and question witnesses about the YouCut Video during the prolonged, two-year discovery period. Plaintiffs conducted a walk-though inspection of Suite 480 on October 5, 2021, nearly 18 months before Defendants filed their Motion. Defendants put Plaintiffs on notice more than 14 months before filing their Motion when Defendants first raised challenges about the authenticity of the YouCut Video. Doc. 91. In sum, Plaintiffs have had an extended amount of time address Defendants' arguments and develop the evidentiary record. Plaintiffs have not shown Defendants' Motion was premature, was pressed without adequate conferral, or filed in bad faith.

## II.   Plaintiffs Willfully Fabricated Evidence in Bad Faith[16]

Despite the extensive amount of litigation devoted to the YouCut Video and the lengthy discussion provided here, the current dispute centers on a simple, narrow question: Did Mr. Frazier record the YouCut Video (or, more specifically, the original videos used to make the YouCut Video) in Suite 480 on February 25, 2020? Plaintiffs insist he did. Defendants insist he did not. There is no middle ground. Neither party has offered any other plausible explanation.

---

[16]   A court typically may only impose sanctions under its inherent authority where there is a finding of bad faith. See Martin, 307 F.3d at 1335. Additionally, in order to impose a sanction of dismissal with prejudice, a court must find the sanctioned party's conduct was willful. See Zocaras, 465 F.3d at 483. In this matter, the bad faith and willful inquiries are largely coextensive. If Plaintiffs fabricated the YouCut Video, then they did so both willfully and in bad faith. Therefore, I address both inquiries together.

Importantly, each party's position necessarily requires a finding the opposing party willfully fabricated evidence and acted in bad faith.  If Plaintiffs are correct, then Defendants have engaged in a conspiracy to change the appearance of the Suite 480 exam rooms and cover up any evidence of that change through dishonest testimony and possible fabrication of documentary evidence.  If Defendants are correct, then Plaintiffs willfully fabricated the YouCut Video, which would mean Plaintiffs staged the video, manufactured bloody, foreign items, and falsely testified about the fabrication.

Having considered the entire record in this matter, I find by clear and convincing evidence Mr. Frazier did not record the original videos used to make the YouCut Video in a Suite 480 exam room on February 25, 2020.  Dr. Stevenson examined Mr. Frazier in Suite 480 on February 25, 2020, in exam room 1, 2, or 3.  The appearance of Suite 480 exam rooms and the appearance of the room in the YouCut Video are plainly different in several material ways. The appearance of the exam rooms in Suite 480 has not changed since February 25, 2020, when Plaintiffs say Mr. Frazier recorded the video.  Plaintiffs have not presented any objective evidence to explain the differences in appearance between the room shown in the YouCut Video and the exam rooms in Suite 480.  Based solely on the physical appearance of the various rooms, I would find by clear and convincing evidence Mr. Frazier did not record the videos used to make the YouCut Video in Suite 480 on February 25, 2020.

But there is other evidence, beyond the differences in the physical appearance of the exam rooms, that supports my conclusion.  Plaintiffs' own medical expert expressed doubt that all the materials visible in the YouCut Video could have been removed from Mr. Frazier's nose. Even so, Plaintiffs maintain even more materials were removed from Mr. Frazier's nose, but the materials are not visible in the video.  The fact that Plaintiffs' own medical expert doubts

Plaintiffs' representations about what is shown in the video seriously undermines Plaintiffs'

claims about the authenticity of the video.  I have also considered evidence provided by the

forensic experts.  The forensic experts provide little helpful information about exactly where and

when the YouCut Video was recorded, but the one thing they agree on is the metadata Plaintiffs

relied on could be fabricated and relatively easily so.  The ease with which Plaintiffs could

falsify metadata in support of their fabrication of video evidence supports my conclusion.

Because I conclude the YouCut Video was not recorded in Suite 480 on February 25,

2020, and Plaintiffs have not offered any other plausible explanation for the origin of the YouCut

Video, I necessarily must conclude Plaintiffs willfully fabricated the YouCut Video in bad faith.

Obviously, the YouCut Video could not have been created by accident.  Mr. Frazier deliberately

recorded himself and the purported bloody, foreign materials at some unknown location on some

unknown date.  There is no suggestion Mr. Frazier attended some other legitimate medical

procedure, recorded the YouCut Video during that procedure, and then passed it off as a

recording from the February 25, 2020 exam by Dr. Stevenson.  Therefore, the only plausible

explanation is Mr. and Mrs. Frazier deliberately staged the YouCut Video scene and created

fake, bloody foreign items, all for the purpose of manufacturing evidence to use in this case

against Defendants.  Plaintiffs' conduct was plainly willful and done in bad faith.

Unfortunately, the misconduct goes further.  At some point, the original video files were

deleted, forever destroying critical metadata, and the YouCut Video was created.  Screenshot 1

and Screenshot 2 were inexplicably created, which purport to show metadata from the original

files.  The experts agree the metadata that have been provided could be faked, and, possibly,

easily so.  Given the conclusions above, the destruction of the original video files and the

creation of the screenshots are entirely consistent with a deliberate effort to cover up the initial

fabrication. Indeed, the creation of the screenshots is particularly troubling.  Plaintiffs created

screenshots showing the original video file metadata in an effort to reinforce the fabricated

YouCut Video, knowing the dates shown in the screenshots were false, and then offered those

screenshots into evidence to obscure the initial fabrication.  To make matters worse, Plaintiffs

appeared at depositions and the evidentiary hearing before the Court and testified under oath

about the creation of these items, further doubling down on their willful misconduct.  This is bad

faith and willful misconduct of the highest order and warrants the imposition of serious

sanctions.

     In defense to the allegations of misconduct, Plaintiffs generally question the sufficiency

of the evidence of their misconduct but offer little in the way of their own explanation or

evidence.  As set forth above, the evidence of misconduct is substantial and is more than

adequate to support a finding of willful, bad faith misconduct by clear and convincing evidence.

Plaintiffs' attempts to point to minor gaps in the evidentiary record do not undermine this

conclusion.

     Plaintiffs vaguely assert two alternative theories for the obvious differences in the

appearance of the room in the YouCut Video and the Suite 480 exam rooms: (1) Dr. Stevenson

examined Mr. Frazier in a different location with a different appearance than his exam rooms 1,

2, or 3; or (2) the appearance of the Suite 480 exam rooms materially changed between February

25, 2020 and October 5, 2021, when Plaintiffs conducted their inspection.  At the evidentiary

hearing in this matter, Plaintiffs' counsel was equivocal about which of the two explanations is

the actual explanation, suggesting either explanation was possible.  But Plaintiffs and their

counsel were unable to point to any compelling evidence that supported either of these two

theories, and, instead, relied on speculation.  Regardless, neither of these theories are supported by any evidence, and the Court should reject them.

Plaintiffs' overall defense to the allegations of misconduct is built on a web of coincidences and assumptions that are too farfetched to believe.  Plaintiffs suggest on February 25, 2020, Dr. Stevenson examined Mr. Frazier in an exam room in Suite 480, but not one of Dr. Stevenson's ordinary exam rooms, and the room used looked materially different from the ordinary exam rooms.  Or, perhaps, the exam occurred in one of the ordinary exam rooms, but Dr. Stevenson and numerous SGHS employees conspired to make radical renovations to the exam rooms after the examination, and then covered up and lied about the renovations. Regardless, during the exam—but not when Dr. Stevenson or any other SGHS employee was present—Mr. Frazier recorded direct evidence of Dr. Stevenson's malpractice.  Despite the importance of the recording, Mr. Frazier destroyed the original video files, severely hindering the ability to investigate and evaluate the authenticity of the recordings.  Then Plaintiffs filed this suit but did not mention the critical video for the first several months of the litigation.  Plaintiffs then fiercely opposed any forensic examination of Mr. Frazier's cellphone, despite arguing the deletion was an innocent mistake.  Now Plaintiffs are noncommittal on what actually happened, suggesting they are merely victims of circumstances.  Plaintiffs' theories are implausible on their face and are simply incredible when compared to the substantial evidence Defendants presented.

Ultimately, I find by clear and convincing evidence Mr. and Mrs. Frazier willfully fabricated video evidence in bad faith to bolster a pivotal claim in this case.[17]  Therefore, the imposition of sanctions is appropriate.

---

[17]     Plaintiffs have suggested the Court already determined they did not act in bad faith.  That is incorrect.  Defendants previously moved the Court to sanction Plaintiffs for failing to timely produce original video files.  I denied Defendants' motion and found Plaintiffs had "not acted evasively or in bad

However, I do not find Plaintiffs' counsel, Mr. Thomas, engaged in willful or bad faith misconduct.  Mr. Thomas has repeatedly asserted the YouCut Video is authentic and defended Plaintiffs' reliance on the video.  That position appears to be motivated by Mr. Thomas's earnest belief in his clients.  While not all lawyers would persist in advocating for their clients in circumstances like these, this does not mean Mr. Thomas knowingly engaged in or perpetuated Plaintiffs' misconduct.  Indeed, there is no evidence Mr. Thomas engaged in any misconduct.

## III.    Sanctions Less Than Dismissal Are Not Appropriate

The parties take an all-or-nothing approach to sanctions.  At the September 18, 2023 evidentiary hearing, Defendants' counsel argued dismissal with prejudice is the only appropriate sanction.  Plaintiffs' counsel argued it would be inappropriate for the Court to impose any sanctions.  Even when Plaintiffs' counsel was pressed to assume for argument's sake Plaintiffs engaged in willful, bad faith conduct, counsel did not propose any sanction short of dismissal with prejudice.

Lesser sanctions—i.e., sanctions short of dismissal with prejudice—might include monetary sanctions, exclusion of the YouCut Video, adverse jury instructions, striking Plaintiffs' Complaint, or dismissal without prejudice.  None of these lesser sanctions are appropriate in these circumstances.  Dismissal with prejudice is the only appropriate sanction.

Courts simply cannot tolerate deliberate attempts by parties to present fabricated evidence, especially image and video evidence.  "The American judicial system depends on the integrity of the participants, who seek the truth through the adversarial but good-faith

---

faith" in failing to produce the original video files because the original files no longer exist.  Doc. 58 at 7. That ruling only concerned whether Plaintiffs had complied with their discovery obligations and is not analogous to, or binding on, the issue addressed in this Report.  Defendants now raise a different challenge and rely on different—and far more extensive—evidence.

presentation of arguments and evidence."  <u>Roche Diagnostics Corp.</u>, 2020 WL 2308319, at *1.
"The federal case law is well established that dismissal is the appropriate sanction where a party
manufactures evidence which purports to corroborate its substantive claims."  <u>Vargas</u>, 901 F.
Supp. at 1581 (collecting cases).

      The severity of Plaintiffs' misconduct plainly warrants dismissal with prejudice as a
sanction.  Dismissal with prejudice is appropriate because Mr. and Mrs. Frazier fabricated the
YouCut Video.  Mr. and Mrs. Frazier testified at depositions under oath the YouCut Video was
recorded in Suite 480 on February 25, 2020.  That testimony was false.  Mr. Frazier recorded the
YouCut Video in a place other than Suite 480 with the deliberate intent to fabricate evidence.
Mr. Frazier then edited the video and destroyed the original video files.  Plaintiffs conducted a
site inspection and observed the differences between Suite 480 and the place where Mr. Frazier
recorded the YouCut Video.  Even after being confronted with glaring contradictory evidence,
Plaintiffs did not attempt to withdraw the video or provide a plausible explanation for the
differences.  Instead, Mr. and Mrs. Frazier testified under oath again, this time in open court, the
video was filmed in Suite 480 on February 25, 2020.  Mr. and Mrs. Frazier's efforts to fabricate
the YouCut Video and to falsely testify to its authenticity weigh strongly in favor of the harsh
sanction of dismissal with prejudice.

      Plaintiffs' misconduct has caused Defendants significant unfair prejudice.  This prejudice
supports dismissal with prejudice and cannot be remedied with lesser sanctions.  This case has
been litigated for more than two and a half years.  A large portion of that litigation concerns the
events of February 25, 2020, and the YouCut Video.  Defendants have expended significant
resources investigating Plaintiffs' claims and evidence.  It would be unjust to subject Defendants

to continued litigation costs when they have already expended so much to counter Plaintiffs' misconduct.

Lesser sanctions that would involve this case going forward in any form would be inadequate for protecting this Court's integrity.  Dismissal with prejudice as a sanction "addresses not only prejudice suffered by the opposing litigants, but also vindicates the judicial system as a whole, for such misconduct threatens the very integrity of courts, which otherwise 'cannot command respect if they cannot maintain a level playing field amongst participants.'" Chemtall, Inc. v. Citi-Chem, Inc., 992 F. Supp. 1390, 1409 (S.D. Ga. 1998) (citing Derzack v. County of Allegheny, 173 F.R.D. 400, 414 (W.D. Pa. 1996)).  Allowing Plaintiffs to pursue these claims further would threaten the integrity of the Court, given Plaintiffs' demonstrated disregard for this institution.  See Oniha, 2022 WL 580933, at *2 (holding "no sanction short of complete dismissal would be sufficient to deter future misconduct and 'vindicat[e] judicial authority'" where plaintiff fabricated evidence and lied about it) (alteration in original) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 46 (1991)).  Given the fabrication of such significant evidence, all of Plaintiffs' other allegations and evidence would necessarily be suspect, exponentially expanding this litigation.

Dismissal of Plaintiffs' case with prejudice would also deter others from engaging in similar misconduct.  Plaintiffs' conduct "so violates the judicial process that imposition of a harsh penalty is appropriate not only to reprimand the offender, but also to deter future parties from trampling upon the integrity of the court."  Parcher v. Gee, No. 8:09-CV-857, 2016 WL 7446630, at *12 (M.D. Fla. Oct. 19, 2016) (citing Zocaras, 465 F.3d at 484), report and recommendation adopted, 2016 WL 7440922 (M.D. Fla. Dec. 27, 2016).  Image and video evidence is ubiquitous and often highly persuasive.  Technological advancements continually

increase the risk of fabrication of such evidence.  Therefore, when confronted with fabrication of video and image evidence, the Court should take appropriate steps to deter others from engaging in similar misconduct.  This need for deterrence further supports dismissing Plaintiffs' claims with prejudice as a sanction.

In sum, I have considered other, lesser sanctions, but I find them inadequate.  Plaintiffs willfully fabricated video evidence in bad faith, and dismissal with prejudice is the only adequate remedy.

## CONCLUSION

For the reasons described above, I **RECOMMEND** the Court **GRANT** Defendants' Motion and **DISMISS with prejudice** Plaintiffs' Complaint.

Any objections to this Report and Recommendation shall be filed within 14 days of today's date.  Objections shall be specific and in writing.  "Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to." Marsden v. Moore, 847 F.2d 1536, 1548 (11th Cir.1988).  Failure to file timely, written objections will bar any later challenge or review of the Magistrate Judge's factual findings and legal conclusions.  28 U.S.C. § 636(b)(1)(C); Harrigan v. Metro Dade Police Dep't Station #4, 977 F.3d 1185, 1192–93 (11th Cir. 2020).  To be clear, a party waives all rights to challenge the Magistrate Judge's factual findings and legal conclusions on appeal by failing to file timely, written objections.  Harrigan, 977 F.3d at 1192–93; 11th Cir. R. 3-1.  A copy of the objections must be served upon all other parties to the action.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a de novo determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in

whole or in part, the findings or recommendations made by the Magistrate Judge.  Objections not

meeting the specificity requirement set out above will not be considered by a District Judge.  A

party may not appeal a Magistrate Judge's report and recommendation directly to the United

States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final

judgment entered by or at the direction of a District Judge.

**SO REPORTED AND RECOMMENDED**, this 8th day of November, 2023.

 

 

BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA